OCEAN SANDS HOLDING CORPORATION, A VIRGINIA CORPORATION, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ocean Sands Holding Corp. v. Commissioner
Docket Nos. 4261-72, 4262-72, 4728-75, 5139-76, 5140-76, 5141-76, 5142-76, 5143-76, 5976-76, 6602-76, 7352-76, 4927-77, 4928-77, 4929-77, 4930-77, 7489-77, 7509-77, 7510-77, 7560-77, 8027-78, 8028-78, 8029-78.
United States Tax Court
T.C. Memo 1980-423; 1980 Tax Ct. Memo LEXIS 164; 41 T.C.M. (CCH) 1; T.C.M. (RIA) 80423; September 23, 1980, Filed Russell W. Chaplain, Sr., pro se in docket Nos. 4262-72, 5976-76, 7510-77, and 8027-78. Allen J. Gordon, for all other petitioners. John C. McDougal and Michael R. Moore, for the respondent. *167 FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: These consolidated cases were tried before Special Trial Judge Lehmann C. Aarons pursuant to Rule 180, Tax Court Rules of Practice and Procedure. His report was served on the parties, and both parties filed exceptions. After careful consideration, the Special Trial Judge's report, which is set forth below, is adopted with minor modifications. REPORT OF SPECIAL TRIAL JUDGE *
AARONS, Special Trial Judge: Respondent determined deficiencies in petitioners' federal income tax and additions to tax in these twenty-two consolidated cases as follows: Ocean Sands Holding Corporation
Docket
Additions to the Tax
No.
Year
Deficiency
Sec. 6653(a)
Sec. 6653(b)
4261-72
1967
$ 8,914.24
$ 445.71
4261-72
1968
52,926.15
2,646.31
4261-72
1969
53,175.15
2,658.76
5140-76
1971
43,758.90
$21,879.45
5140-76
1972
25,854.31
12,927.16
4928-77
1973
35,407.27
17,703.64
Colony Holding Corporation
5143-76
1972
$67,550.48
$33,775.24
4927-77
1973
56,467.60
28,233.80
Sea Fin Holding Corporation
5139-76
1971
$55,352.02
$27,676.01
5139-76
1972
48,797.82
24,398.91
4930-77
1973
55,143.93
27,571.97
Chattel Corporation
5141-76
1971
$ 660.00
5141-76
1972
660.00
Sea Star Corporation
5142-76
1971
$ 550.00
5142-76
1972
550.00
4929-77
1973
550.00
Russell W. Chaplain, Sr.
and Elsie C. Chaplain
4262-72
1965
$ 26,202.01
$1,310.10
4262-72
1966
27,868.53
1,393.43
4262-72
1967
22,038.30
1,101.92
4262-72
1968
17,497.42
874.87
4262-72
1969
20,219.93
1,011.00
5976-76
1971
145,933.69
$ 72,966.85
5976-76
1972
116,152.50
58,076.25
7510-77
1973
124,391.63
62,195.82
8027-78
1974
348,352.20
174,176.10
Russell W. Chaplain, Jr.
and Mary H. Chaplain
4728-75
1971
$ 525.00
7352-76
1972
112,600.50
$56,300.25
7509-77
1973
120,209.63
60,104.82
William J. Newton III
and Linda G. Thornton
6602-76
1972
$ 51,955.83
$ 25,977.92
7560-77
1973
62,017.37
31,008.69
8029-78
1974
355,211.08
177,605.54
William G. Chaplain
and Sandra B. Chaplain
7489-77
1973
$121,295.83
$ 60,647.92
8028-78
1974
345,428.72
172,714.36
*168 The issues for decision are: (1) With respect to Ocean Sands Holding Corporation for the years 1967 through 1969; a) whether its gross receipts were understated; b) whether its telephone income was understated; c) whether its deductions for depreciation and for miscellaneous expenses were overstated; d) whether respondent properly adjusted the claimed net operating loss deductions (1967 and 1968 only); e) whether the statute of limitations bars the assessment and collection of the asserted deficiencies (1967 only); f) whether, if taxable income was understated, any part of the underpayments was due to negligence. With respect to Ocean Sands for the years 1971 through 1973: g) whether its gross receipts were understated; h) whether its deductions for depreciation and miscellaneous expenses were overstated; i) whether respondent properly adjusted a claimed net operating loss deduction (1971 only); and j) whether if taxable income was understated, any part of the underpayments was due to fraud. (2) With respect to Colony Holding Corporation for the years 1972 and 1973: a) whether its gross receipts were understated; b) whether its deductions *169 for depreciation and miscellaneous expenses were overstated; and c) whether any part of the alleged underpayments was due to fraud. (3) With respect to Sea Fin Holding Corporation for the years 1971 through 1973: a) whether its gross receipts from its motel were understated; b) whether its gross receipts from its trailer park business were understated; c) whether its deductions for depreciation and miscellaneous expenses were overstated; and d) whether any part of the alleged underpayments was due to fraud. (4) With respect to Sea Star Corporation for the years 1971 through 1973: a) whether its claimed net operating loss carryover deductions were properly disallowed by respondent, and whether it is entitled to its claimed deduction for taxes in each of the years and for interest expense in 1971. (5) With respect to Chattel Corporation for the years 1971 and 1972: a) whether its claimed net operating loss carryover deductions were properly disallowed by respondent, and whether it is entitled to its claimed deduction for taxes in each of the years and for interest in 1971. (6) With respect to Russell W. Chaplain, Sr. and Elsie Chaplain for the *170 years 1965 through 1969: a) whether their gross business receipts were understated; b) whether their telephone income for 1967 through 1969 was understated; c) whether their deductions for depreciation and miscellaneous business expenses were overstated; d) whether the statute of limitations bars the assessment and collection of the asserted deficiencies; e) whether, if taxable income was understated, any part of the underpayments was due to negligence. With respect to Russell W. Chaplain, Sr. and Elsie Chaplain for the years 1971 through 1974: f) whether in 1971 they realized but failed to report a capital gain on the alleged sale of 913 Virginia Beach Boulevard; g) whether they received unreported dividend income in cash and in kind from two or more of the corporate petitioners in each of said years; h) whether deductions for depreciation on a service station and for rental expense were overstated for 1971; i) whether they are entitled to a personal exemption in 1971 for their daughter Linda; and j) whether any part of the alleged underpayments was due to fraud. (7) With respect to Russell W. Chaplain, Jr. and Mary H. Chaplain for the years 1971 *171 through 1973: a) whether they received unreported dividend income in cash and in kind from one or more of the corporate petitioners in each of said years; and b) whether any part of the alleged underpayments was due to fraud. (8) With respect to William Newton, III and Linda G. Thornton for 1972 through 1974: a) whether they received unreported dividend income in cash and in kind from two or more of the corporate petitioners in each of said years; b) whether they received unreported wages or salary in 1972 and 1973; c) whether they understated rental income in 1973; d) whether, for 1974, their deductions for depreciation and miscellaneous expenses with respect to rental property were overstated; e) whether, for 1974, they overstated their cost in reporting gain on the sale of real property; and f) whether any part of the alleged underpayments was due to fraud. (9) With respect to William G. Chaplain and Sandra B. Chaplain for 1973 and 1974: a) whether they received unreported dividend income from three of the corporate petitioners in each of said years; and b) whether any part of the alleged underpayment was due to fraud. In an effort to achieve *172 clarity and coherence in our treatment of these numerous and overlapping issues, our opinion will be organized by topic rather than by taxpayer. After setting forth our general findings of fact, we will deal with the issues, each with its separate findings of fact and opinion, in the following order: I. Business gross receipts II. Business depreciation III. Miscellaneous business expense deductions IV. Net operating loss deductions V. Fraud penalties, corporate petitioners VI. Gain on transfer of real property to Sea Fin by Russell W. Chaplain, Sr. and Elsie Chaplain. VII. Dividend income and fraud, individual petitioners VIII. Miscellaneous issues and fraud, individual petitioners IX. Negligence penalties X. Statute of limitations. In his reply brief petitioners' counsel requests "leave to argue the matter orally, if the Court desires." See Rule 151 of this Court's Rules of Practice and Procedure. Particularly in view of the voluminousness of the briefs on file herein and the factual nature of the issues, the Court deems oral argument to be neither necessary nor appropriate. GENERAL FINDINGS OF FACT Some of the facts have been stipulated and *173 are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Only those facts necessary for an understanding of this Opinion will be summarized below. All of the corporate petitioners are Virginia corporations with their principal places of business in Virginia Beach, Virginia.With the exception noted below, all of the individual petitioners resided in Virginia Beach, Virginia, at the time the petitions were filed herein. William G. Chaplain and Sandra B. Chaplain were divorced prior to the time their petitions in docket No. 8028-78 were filed. At that time Sandra resided in Clearwater, Florida. All of the returns for the years at issue were timely filed, and all the individual returns were joint returns. All petitioners used the cash receipts and disbursements method of accounting. The corporate "returns" of Ocean Sands Holding Corporation (Ocean Sands), Sea Fin Holding Corporation (Sea Fin), and Colony Holding Corporation (Colony Corp.) for the year 1974 were filed (under an extension) with the Internal Revenue Service on September 15, 1975. The return forms set forth no income or deduction figures, but each of them contained *174 the statement "A completed return is not being filed due to the IRS exam of prior years in which an obvious dispute affecting 1974 income will result. An amended return will follow." At the time of trial an audit of these three corporations for 1974 was in progress but had not yet been completed. During the course of this audit, in mid-1976, additional unsigned 1974 corporate return forms 1120 for the three corporations were presented to and received by the examining agent. The unsigned 1120's contained the income and deduction figures which were lacking on the signed, but black, forms which had been filed on September 15, 1975. Russell W. Chaplain Sr. and Elsie C. Chaplain (Wilson and Elsie) are the parents of eight children, including petitioners Russell W. Chaplain, Jr. (Chappy), William G. Chaplain (Jerry) and Linda G. Thornton (Linda), and another daughter, Suzanne Goldsticker (Suzanne), who is not a petitioner herein. Some understanding of the family history of the Chaplains and their financial transactions is essential to a fair and proper evaluation of the merits of these cases. Wilson, who is approaching 60 years of age, is a man of complex personality characteristics. *175 As witnessed by the Court during both the trial and the preliminary stages of these cases, he is highly emotional and subject to intermittent and well-nigh uncontrollable outbursts of anger and vituperation. His hostilities are directed against federal, state and local tax collecting and regulatory authorities, against banking institutions, and against family members of the former spouses of his divorced children. He is ruggedly and fiercely individualistic and patently supportive of the "work ethic;" his hostility is evoked by institutional or individual attempts to trespass (either physically or figuratively) on his private domain. [2]
Since about 1950 Wilson has suffered severely from "sugar" diabetes. It is his belief that at the times when his "nervous pancreas" permits his glucose *176 to reach a high level, he has the greatest of difficulty in controlling his emotional outbursts, and that when his pancreas is doing its job, he is capable of normal social behavior. Whether or not such correlation is medically supportable is beyond the ken of this Court. Wilson's behavioral problems have had significant effects upon the history and development of these cases. Illustrating one such effect is the experience of Winfred H. Cartwright, who was employed in December 1975 in the arson investigation branch of the Virginia Beach Fire Department. A fire had occurred in that month in the Cadillac car which was used by Jerry and allegedly destroyed the records of the three operating corporations herein involved. Respondent intimates that the cause was arson on the part of one of the petitioners. Petitioners claim that the fire was set by one of a number of persons who had grudges against Jerry or other Chaplain family members. Cartwright interviewed Jerry on the day after the fire and reached the point of asking him if he had any recent misunderstandings or arguments. Jerry gave an affirmative answer and identified at least one such adversary by name. However, before *177 the interview could proceed further, Wilson appeared on the scene and belligerently (and apparently contrary to his own best interests) ordered his son to end the conversation. The record is replete with other instances in which regulatory and other government officers were summarily ordered by Wilson to leave his premises. Another of Wilson's behavioral irregularities which pervades these cases is his abiding dislike and distrust of banks. This was a characteristic which he claims he acquired from his own father. Without detailing the various incidents in the lives of both the father and Wilson which reinforced this dislike, it is clear that both of them cherished the physical possession of large amounts of currency which they kept in secluded safes on the premises in which they lived or worked. This practice was motivated at least in part by a congenital distrust of big institutions (both financial and governmental). As strong, and often irrational, as was Wilson's hostility towards those who (in his view) had trespassed on his private domain, he showed notable generosity and kindness to those whom he regarded as his friends or friends of any member of his family and to *178 trusted employees. He was no more "businesslike" in his dealings with such people than he was in the handling of cash assets.Again the record is replete with instances in which free rooms and meals and telephone privileges were furnished to friends and acquaintances of his children, to visiting friends of his from other areas, to workmen who were employed on the premises, and to impecunious guests. Wilson was the patriarch and "the brain" of the Chaplain family; his thought patterns and precepts (although engendering many and bitter intra-family feuds) were guidelines for the history and the conduct and operational practices of the family businesses. Wilson was brought up on his father's strawberry and vegetable farm located just west of Virginia Beach, Virginia. From an early age he worked on the farm with his father, and it was a prosperous operation. In the early 1940's the farm was sold under threat of condemnation to make room for the Oceana Naval Air Station, and that was the end of Wilson's farming career. He had, by that time, saved close to $200,000 from his share of the farming enterprise. Earlier (in 1941) Wilson had married Elsie, and in 1942 their eldest child, *179 Suzanne, was born. Wilson's father had taken a strong liking toward Elsie and at various times made gifts to her "for her and the children." One of those gifts (made in the late 1950's) was a transfer into Elsie's name of real property located at False Cape (Virginia Beach), Virginia. That land likewise was subsequently condemned for a public park, and in 1972 Elsie received the proceeds of $68,000, which was in turn invested in the Kona Kai East, an oceanfront motel. On two other occasions (around 1960) Wilson's father gave Elsie $20,000 in cash (a total of $40,000) "for the children." This money likewise was invested in the land on which one of the Chaplain's two oceanfront motels is located. Wilson's mother, Gussie, appears as one of the record owners of some of the real estate involved herein. Her role, if any, in these cases must remain a mystery. Although still living, she was not called as a witness and her participation, if any, was totally unexplained. After the Oceana sale Wilson and Elsie moved to Virginia Beach. There they engaged in a series of purchases and sales of real property and profited on such transactions. Wilson also became an auto dealer for Kaiser-Frazer *180 in Virginia Beach during that period and did well financially in that endeavor. One of the properties which the Chaplains began to acquire in the early 1940's was the property which eventually became the Colony Motel and Trailer Court, at 913 Virginia Beach Boulevard, in Virginia Beach. This was not oceanfront property. It was located in a swamplike area and had to be reclaimed from that condition in order to accommodate a trailer park. A portion of that property was acquired by adverse possession, evidenced by several deeds in 1965 from "special commissions." The Chaplains constructed a home for themselves and their children at 913 Virginia Beach Boulevard in the mid-1950's. The home was later expanded for use as a small motel. The back-land was cleared, drained and improved for trailer court purposes on a gradual basis over the years through the personal direction of the senior Chaplains and the physical labor of the children--in particular Chappy and Jerry--and of other workmen hired "off the street" by the Chaplains as needed. The trailer court business was the main source of revenue from that property.In 1971 the Colony Motel and Trailer Park property, as well as an adjacent *181 Phillips 66 service station (also acquired by them in the mid-1950's), were conveyed to a then newly organized corporation, Sea Fin Holding Corp. Another of the properties herein involved was purchased from a church by Ocean Sands Holding Corporation in 1964. This land was located in Virginia Beach at 18th Street between Atlantic Avenue and the oceanfront. In January 1966 a permit was issued to Ocean Sands to build the Kona Kai motel. The motel was built under the planning and direction of Wilson, and again much of the construction was accomplished by the physical labor of Chappy and Jerry and others of the Chaplain children.The Kona Kai originally had 36 rooms plus a 4 room apartment. In January 1975 a permit was issued to Ocean Sands to add 4 more stories to the Kona Kai, and that addition was constructed much in the same fashion as the original structure.
A third property, located on 16th Street between Atlantic Avenue and the oceanfront, was purchased by Colony Corp. in 1961. At the time of the purchase there was an old Hotel, the Courtney Terrace, on the property. That hotel was demolished--partly as a result of an explosion or fire in 1969--and a new motel, the Kona Kai *182 East, was constructed by the Chaplain family and completed in 1972. Two unimproved lots between 18th and 19th Streets on the oceanfront were owned during the years at issue by Chattel and Sea Star Corporations, respectively, and were used by Ocean Sands under a rental arrangement. The lots were also used under a rental arrangement by the Colony Motel and Trailer Park so that their customers had parking facilities for ocean swimming. Although none of the stock books of Ocean Sands, Colony Corp., Sea Fin, Chattel or Sea Star is in evidence, it appears that whatever stock may have been issued by such corporations was issued in Elsie's name. The record is replete with evidence that Elsie, as well as Wilson and the children, regarded the entire operation or sets of operations as one big family partnership, with no definition of beneficial ownerships except that those who contributed to the operations were to be rewarded in proportion to their contributions. Inevitably, this loose communal arrangement has led to bitter intra-family feuds, elements of which were manifested to a convincing extent in the courtroom during various stages of these proceedings. A genuine dispute exists *183 within the family as to the beneficial ownership of the stock of the various corporations. The Court does not make any specific finding on that score. The looseness of the handling and operation of the Chaplain enterprises is witnessed throughout the record. For example, Elsie received a salary from Sea Fin and no compensation from Ocean Sands or Colony Corp., although she performed some services for all three corporations. Laundry services were performed by Sea Fin for Ocean Sands and Colony, Inc. without any apparent effort to settle the costs and expenses between them. One or more automobiles owned by one of the corporations were used for business purposes of another of the corporations and to some degree for personal purposes, without any apparent effort to account to the owning corporation. In their own minds, the Chaplains created the corporations (on advice from their attorneys and accountants) for family planning purposes and to prevent intrusion by outsiders, but they did not let the corporate entities interfere with their concept of the total operation as one big family enterprise.In spite of this blurring of corporate entities, respondent has not sought to reallocate *184 the corporate income and deductions under section 482 of the Code. [3]
The looseness in the operation of the Chaplain businesses was also evident in their bookkeeping. The records which the petitioners kept in the regular course of business for the motels and the trailer park were less than complete. In spite of the recommendation of their accountant, petitioners never instituted a standard system of double-entry bookkeeping. Instead, as an example, the records of Ocean Sands and Colony Corp. consisted of room registration cards (to reflect income) and cancelled checks (to reflect expenses). The records also included telephone receipt books, cash receipt books and a number of invoices. For the trailer park there were no registration cards, but cash receipt books were maintained. Bookkeeping practices at the motels and trailer park were irregular. For example, it was the routine practice of Linda, who helped keep what records of Sea Fin there were for 1971 through 1973, to discard a bill if she had a cancelled check to indicate its payment. She may or may not have *185 kept a record of those expenses paid in cash. Petitioners also failed to preserve diligently those business records that were made. This failure stems from circumstances revealed in the following two statements from the testimony of Wilson: "I hate records worst than anything in the world." "Well, see, we've had quite a few fires." There were indeed three fires and one alleged theft -- all involving alleged destruction or loss of records -- which tempt the trier of fact to place these statements in context with each other, with the obvious conclusion to be drawn from doing so. The Pine Tree Inn fire in 1965 or 1966, destroying a car belonging to Suzanne's husband, occurred outside that restaurant while Suzanne and other family members were attending a "good government" meeting. All the records of the Colony Motel and Trailer Park up to that date were in the car because of a pending court proceeding involving sales tax. The records were allegedly destroyed. The fire was the result of a multiple car collision causing one of the involved cars to go out of control and to smash into the car containing the records. The Castaways fire (and explosion) occurred in 1969 and *186 allegedly destroyed all the records of the Kona Kai (Ocean Sands) and the post-1965 or 1966 records of the Colony Motel and Trailer Park.The Castaways (formerly the Courtney Terrace) was located at 16th and Ocean Front and was in the process of demolishment to make way for a new motel, the Kona Kai East. Some time before the fire one of the Chaplains had requested (but was denied) permission to complete the demolition by burning. The building had been substantially demolished, but at least the first floor and basement remained, and it was in those areas that the records were kept. At that time Suzanne and at least some other family members were still living in the Castaways and maintained an office there. The post-1969 records of each of the corporate petitioners were allegedly destroyed on December 9, 1975, in the rear portion of a Cadillac used by Jerry. The car was parked at the time behind the Colony Motel. The records were those which were then being audited by Revenue Agent Graubics. He had microfilmed all the records except possibly those of Sea Fin, for which he had delivered formal document requests to petitioners' accountant the day before the fire. The Chaplain *187 family knew of such microfilming and one or more family members may have assumed that the Sea Fin records had been microfilmed. The fire (very severe in nature) was of incendiary origin and was alleged by petitioners to have been caused by an enemy who had a grudge against Jerry. Aside from the question whether the Cadillac fire could have destroyed so large a volume of records leaving barely a trace, there is evidence in the record which conflicts with such alleged total destruction. On December 17, 1975, Elsie filed a report with the local police alleging theft from the Kona Kai premises of corporate and business papers belonging to Ocean Sands, Sea Fin, Colony Corp., Chattel and other corporations. The report alleges that Elsie and her family "have been threatened by a person claiming to be a member of a Federal Agency." The record demonstrates, however, that the corporate papers in question (mostly Sea Fin records) were taken by Suzanne and Chappy to the office of an attorney, Mr. Fine, of the Norfolk firm of Fine, Fine, Legum & Fine. It was that firm which represented Suzanne and Chappy in a lawsuit against Elsie, other family members and various family corporations, which *188 was commenced January 8, 1976, and is referred to on page 100 herein. When Agent Graubics on January 12, 1976, renewed his request for the records of Sea Fin (which had been reported as having been destroyed in the fire), Elsie answered on January 14 that they were not available because they had been removed or stolen from the corporation's offices. Although none of these records of the corporate petitioners were produced at the trial, the Court finds (based upon the above, upon other conflicts in the record, and upon the incredibility of the petitioners' testimony concerning the December 1975 fire) that at least a substantial portion of the corporate records was not destroyed in that fire. I. BUSINESS GROSS RECEIPTS -- FINDINGS OF FACT AND OPINION
Kona Kai (Ocean Sands) and Kona Kai East (Colony Corp.)
The Kona Kai, an attractive motel located on 18th Street at the oceanfront, opened for business at the end of July 1966. During the years in issue the motel, owned by Ocean Sands, was a three story building containing 40 rooms, 24 of which faced the ocean.However, during at least a portion of 1967, construction on all the rooms was still not completed, the elevator *189 was not functional, and the motel was not ready for full occupancy. In addition, from time to time during the years 1967 through 1973, as many as four rooms were used by Suzanne as a manager's apartment, particularly in the winter. During the peak season, however, she would on occasion curtail her use to only one or two rooms, or move out altogether, as she did for most of 1971 and 1973. Although the motel did contain a restaurant, the restaurant did not remain open throughout all of the years in issue. The Kona Kai East, on the oceanfront at 16th Street, was a five story, 50 unit motel with a manager's apartment on a sixth floor. This apartment, called the "penthouse," was occupied by Wilson and Elsie during at least a portion of the years at issue. All 50 rental units faced the ocean. The Kona Kai East first opened in late April 1972 and closed in early December. During 1973 the motel was open from mid-March to mid-October. Because the elevator was not installed and operative until the summer of 1973, the petitioners had some trouble in renting the rooms on the top floors.There was a restaurant in the Kona Kai East during 1973. The investigation of the returns of Ocean *190 Sands was assigned by respondent to Special Agent Peter Hutts in January 1969. When he and another agent, Harold Starke, were unable to obtain any information from the corporation or the Chaplains about the returns, they contacted the Virginia Department of Taxation. From the sales tax division they received work papers from the state investigation of the Kona Kai. These papers included a reconstruction of gross receipts from room rents for the years 1967 and 1968 based upon the motel's reported laundry expenses. The state investigators divided each month's total laundry expense by an estimate of the daily laundry expense per room. The quotient was multiplied by the estimated average daily charge per room for that month to arrive at a figure for gross receipts. In general, in respondent's investigation of the corporate returns, the agents had a hard time getting information from the Chaplains, especially Wilson, who on more than one occasion ordered agents from his property. He and other corporate officers did not return agents' calls or letters. When meetings were arranged, the principals often did not appear, or they did not bring their records with them. However, the agents *191 were able to meet with Suzanne and Elsie on March 5, 1970, and obtained at that time the following records: the corporate minute book of Ocean Sands for the period May 1964 until March 1970, the Colony Corp. minute book for 1961 through through 1970, check book stubs of the Kona Kai account from May 1967 to June 1969, registration cards for 1966 through 1968, and work papers prepared by Suzanne in connection with the Ocean Sands tax returns. The agents were unable to determine to which of the three years many of registration cards pertained, but the cards reflected total gross receipts for the three years very roughly equivalent to the total gross receipts reported on the tax returns for those years. Agent Starke contacted the VirginiaElectric Power Company (VEPCO), the Chesapeake and Potomac Telephone Company (C&P Phone Co.), and Princess Ann County for information about the Kona Kai. From information provided by the phone company he computed the number of telephone calls made from the Kona Kai. Assuming that the motel charged guests $0.25 per call, Agent Starke reconstructed the amount of income received from telephone charges to guests for the years 1967 through 1969. *192 Agent Starke also reconstructed gross receipts from room rentals for the years 1967 through 1969 using the linen expense method employed by the state tax investigators. Since records of actual charges for various items of linen were not available from the linen supplier, Agent Starke used the same average daily room charge as the state investigators and the lower of their two estimates of the cost of linen per room each day.To check this method of reconstruction, Agent Starke estimated gross receipts using information concerning average motel room charges and charges and occupancy rates which he obtained from the Virginia Beach Chamber of Commerce. He also made a net worth analysis using the scant data that was available. both methods indicated higher gross receipts than his reconstruction based on linen expenses. In June 1974 Revenue Agent Graubics was assigned to examine the returns of Ocean Sands for the years 1971, 1972 and 1973. Agent Graubics also had difficulty obtaining information from the Chaplains, but from May 5, 1975, to mid-June he was permitted to examine certain corporate records at the office of Milton McPherson, an accountant. The records of Ocean Sands which *193 he examined were contained in cardboard boxes labelled as to year and included registration cards, checking account records, records of guests' phone calls indicating the room number and the phone number called, and receipts and invoices. Another box was marked "Bills Paid 1971." Records of Colony Corp., including registration cards, cancelled checks, and receipts and invoices for 1972 and 1973, were also made available to Agent Graubics at the accountant's office. Before he had completed his examination, Agent Graubics was informed that (because of alleged personal misconduct during his examination) he would not be permitted to continue his work in Mr. McPherson's office. He did gain access to the records again in September 1975 and subsequently microfilmed them. At that time some of the telephone slips were missing. In order to reconstruct the income of Ocean Sands for 1971, 1972 and 1973, and of Colony Corp. for 1972 and 1973, Agent Graubics used an entirely new approach based on the assumption that gross receipts per room per month must have been equal to the average receipts per room per month of a group of comparable motels in Virginia Beach. The comparable group (which *194 he selected without first examining their gross receipts) included 14 motels [4] which ranged in size from 20 to 53 rooms. All but three were located on the oceanfront between 10th and 41st Streets. (The boardwalk in Virginia Beach extends from 7th Street to 39th Street.) Although seven of the motels were built between 1964 and 1970, the rest were older, having been built in the late 1950's or before. Only two of the comparables had restaurants serving three meals daily; six others had coffee shops offering only breakfast and lunch.All 14 had swimming pools, and all but five had parking facilities sufficient, when they were filled to capacity, to accommodate 80% to 100% of their guests. Approximately half of the units in the comparable motels faced the ocean. All of the comparable motels were members of groups or associations, for at least a part of the period 1967 through 1973, which provided referral services or through which they advertised. Agent Graubics computed the average gross receipts per room *195 per month for each motel and an average figure for the group of 14 for each month. Using these average monthly gross receipts he calculated the annual gross receipts of the Kona Kai as a 40 unit motel and the Kona Kai East as a 50 unit motel. To accompany his brief in this case, respondent prepared spread sheets showing the gross receipts per room for each month and comparable motel as recomputed to take into consideration the correct number of rooms and to eliminate receipts for one of the motels from cottage rentals. These recomputed figures result in slightly lower gross receipts for the Kona Kai and Kona Kai East than in Agent Graubics' original computations. It is a settled rule of law that where a taxpayer's records are inadequate or nonexistent, respondent may reconstruct income using any method which will, in respondent's opinion, clearly reflect income. Section 446(b); Holland v. United States,348 U.S. 121 (1954); Welch v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. The only restriction on this rule is that the method adopted must be reasonable. Stone v. Commissioner,22 T.C. 893, 905 (1954). *196 Approved methods of income reconstruction have included the "sheet count" method, based upon the number of rented bedsheets used by a motel. In Agnellino v. Commissioner,302 F.2d 797 (3d Cir. 1962), vacating and remanding on other grounds a Memorandum Opinion of this Court, the number of guests (computed from the number of sheets used) was multiplied by the stipulated average room rate. Courts have also approved the use, in reconstruction of income, of information from comparable taxpayers. See, e.g., Meneguzzo v. Commissioner,43 T.C. 824 (1965) (information from comparable restaurant waiters used to determine average tipping rate). [5]
There is no question that the records of Ocean Sands and Colony Corp. are incomplete. Although cash receipt books and telephone slips were kept for Ocean Sands, *197 and although these books were ordered from a supplier by Colony Corp., no such records for Colony Corp. were introduced at trial. Furthermore, there is substantial evidence that the registration cards in evidence do not record all the guests who stayed at the Kona Kai and Kona Kai East. Agent Graubics' analysis of Ocean Sands registration cards and telephone slips reveals that telephone calls were frequently made from rooms for which there were no registration cards -- in over 350 instances in 1971 and more than 650 times in 1973. There are simply too many such calls to be reasonably attributed to non-paying friends of the family. Furthermore, not more than a handful of the telephone slips indicate calls were made from the manager's apartment during those periods it was used as such. In addition, the low occupancy rates reflected in the registration cards also indicate that the cards are not complete. The height of the season for oceanfront motels in Virginia Beach is from mid-June through Labor Day, during which period, in good weather, motel operators can expect to be full or nearly full everyday. However, the registration cards of the Kona Kai for the months of July and *198 August in 1971, 1972 and 1973, indicate that the monthly occupancy rates in the peak season never exceeded 60% of the available rooms. Similarly, according to the cards, the Kona Kai East was never more than 60% full for any month. In fact, the registration cards indicate that neither motel was ever completely full on any day during the three year period or more than 75% full except for a few days each year. (This includes the 4th of July weekend, when all the other oceanfront motels were filled to capacity.) Finally, several persons appeared at trial who were guests at the Kona Kai during 1973 or 1974, but whose visits were not recorded on the registration cards submitted in evidence. Although the registration cards do not accurately indicate the number of guests at the motels, Colony Corp. did not even report all the gross receipts from room rents indicated on the cards. The $58,744 reported on the 1972 return is more than $5000 less than the amount computed from the registration cards. For 1973, the cards indicate gross receipts more than $6000 in excess of the $97,476 reported. One additional factor indicates that Ocean Sands and Colony Corp. underreported their gross *199 receipts. If these corporations actually had the gross receipts and expenses which they reported, they would not have had sufficient cash from that source to make the payments of loan principal which they made--$25,000 each year for Ocean Sands in 1969 through 1973, and $30,000 for Colony Holding in 1973. As the following table indicates, according to the returns both corporations fell far short of netting enough, even before capital outlays, to cover these payments. Amount available
Gross receipts
Cash expenses
for debt reduction
Ocean Sands
1969 $ 62,500.00
50,816.56
11,683.44
1971 106,463.98
86,851.80
19,612.18
1972 78,114.00
76,987.00
1,127.00
1973 105,727.00
96,178.00
9,549.00
Colony Corp.
1973 97,476.00
83,935.00
13,541.00
We believe that respondent was entitled to reconstruct the income of Ocean Sands and Colony Corp. and that the comparable motel method is reasonable and more convincing than the linen expense method of reconstruction. However, the Kona Kai and Kona Kai East differed in several important respects from the average comparable motel. They were not managed in the most businesslike manner.Guests and friends of the Chaplains *200 were sometimes permitted to stay in rooms and to use the facilities free of charge. In its early years of operation the Kona Kai did little advertising and was not affiliated with any trade group or association. Although the motels did have prime oceanfront locations, there were a number of bars in the area which made it more difficult to attract the desirable family trade. The motels' reputations were also harmed by a series of altercations at the Kona Kai involving guests, members of the Chaplain family and police. These altercations occurred during the early years of the Kona Kai's operation. Finally, neither the Kona Kai nor the Kona Kai East had sufficient on-site parking spaces for all their guests. The Kona Kai had only eight spaces until 1969, when it began renting additional spots on a nearby lot owned by Sea Star. The Kona Kai East had parking for 50% of its guests. Besides respondent's reconstructions the only other evidence in this record as to the receipts of the two motels is the bare estimates of various witnesses. Taking all these factors into consideration, we find and conclude that Ocean Sands and Colony Corp. had the amounts of gross receipts (including *201 gross income from the restaurants and from telephone charges) indicated in the table below. To arrive at these figures we have applied a straight 15% discount to the comparable average (except for Ocean Sands in 1967 and Colony Corp. in 1972, in which cases we have allowed an additional 10% since these were the motels' first years of operation). We note that our findings of gross receipts are very roughly equivalent to what would be indicated if we had taken an average of the six least productive comparable motels. Some of the various figures proposed by the parties are also included in the table, for purposes of comparison. GROSS RECEIPTS - PARTIES' CONTENTIONS
OCEAN SANDS
1967
1968
1969
1971
Per
petitioner's
returns
29,106.51
55,497.00
62,500.00
106,463.98
Per statutory
notice
[1] 94,191.30 [1] 157,492.65 [1] 159,920.85 [2] 154,120.00 Per
respondent's
brief,
[4] 94,191.30 [5] 129,111.75 [5] 139,480.25 149,600.00
as recomputed
FINDINGS OF
THE COURT
Gross
Receipts
62,010.00
102,843.20
111,725.70
127,160.00
Average number
of rooms
30
38
38
40
available
COLONY CORP.
1972
1973
1972
1973
Per
petitioner's
returns
78,114.00
105,727.00
54,744.00
97,476.00
Per
statutory
notice
[2] 136,760.00 [3] 199,577.18 [2] 161,700.00 [3] 188,649.00 Per
respondent's
brief,
131,680.00
[6] 144,440.00 152,125.00
[6] 171,600.00 as
recomputed
FINDINGS
OF THE
COURT
Gross
Receipts
106,331.60
122,774.00
[7] 87,930.00 [7] 135,660.00 Average
number of
rooms
38
40
40
40
available
*202 We have not included in the preceding table petitioners' reconstructions of gross receipts which were prepared during trial. These reconstructions, a group effort by the Chaplain family, are based on estimates of room rents and occupancy rates. Suzanne admitted at trial that the estimated figures used were chosen so that the reconstructed amounts would be as close as possible to those *203 reported on the returns. [6] She testified that she knew the figures on the returns were correct and so saw no problem with such a reconstruction. Although the record contains financial statements made by petitioners to various banks concerning the income of their businesses, we have included none of these figures in the above table. Many of the income statements furnished to creditors show gross receipts substantially in excess of those reported. For example, operating statements of Ocean Sands for 1972 and 1973, signed by Suzanne as president, list gross receipts of $180,351 and $201,277.However, except for rent paid to sea Star and legal fees, the expenses shown on the operating statements are generally the same as those shown on the returns. In his explanation of the discrepancies in gross receipts, petitioners' counsel argued that a business always "puts its best foot forward" in its financial statements to its creditors. Although the extent of these discrepancies must be taken *204 into account as a factor in the fraud issues in these cases, the Court does not believe that the operating statements have probative value, under the circumstances of these cases, as to the amounts of the understatements. Colony Motel and Trailer Park (Wilson and Elsie, and Sea Fin) The Colony Motel, at 913 Virginia Beach Boulevard, was located several blocks from the beach. The motel structure was originally built as the Chaplain home, and over the years rooms were added to be rented as motel rooms. Since 1965, the motel has had 24 rooms, of which as many as ten at a time were used as the family residence. During a portion of the years in issue additional rooms were used as an office. Because the Colony Motel was located so far from the beach, room rents were necessarily lower and occupancy rates were not as high as with the oceanfront motels. The trailer park tenants were generally not tourists. Rather, many were military personnel, and the occupancy rate of the park would fluctuate according to how many personnel were assigned to the military installations in the area. The address of the Colony Trailer Park was also 913 Virginia Beach Boulevard during the years *205 in issue, although in earlier years the location had been referred to as 920 17th Street. The Chaplains' trailer park was adjacent to two other trailer parks, and there has always been some confusion as to exactly how many trailer lots were included in the Colony Park. For example, three lots, numbered A, B and C, at the entrance of the Colony Trailer Park were owned by Mr. W. E. Sawyer. The address for these three lots was 919 Virginia Beach Boulevard, although some of the tenants may have used the address 913. Sometime before March 1964, in connection with litigation between the City of Virginia Beach and the Chaplains concerning the amount of license tax owed by the Colony Trailer Park, a physical count of the trailer spaces was taken, and it was determined that the park had 144 spaces. For the years 1965 through 1969, income from the motel and trailer park was reported on the returns of Wilson and Elisie. In 1971 the businesses were transferred to Sea Fin, which filed the returns for 1971, 1972 and 1973. Agent Hutts began in the fall of 1968 to look into the business of the Colony Motel and Trailer Park as a part of his investigation of the individual returns of Wilson *206 and Elsie. When he was unable to meet with either petitioner or gain any information from them, he and Agent Starke contacted VEPCO, C&P Phone Co., and Virginia National Bank for records pertaining to the motel and trailer park. From VEPCO respondent's agents obtained records of electric service for each trailer lot at 913 Virginia Beach Boulevard. The records indicated when connection was made, the number of months service was supplied to each lot, and the customer's name. From these records the agents computed for each year the number of "lot-months," i.e. the sum of the lots each month over the twelve-month period, for which service was provided. At the March 5, 1970, meeting between respondent's agents and Suzanne and Elsie, at which the agents obtained some records of other entities, no records of the Colony Motel and Trailer Park were available. Elsie and Suzanne explained that all other records had been destroyed in the Castaways fire a few months before. Respondent's agents were able to obtain, however, Mr. McPherson's work papers for at least the year 1965.
From the number of lot months for which trailer lots were occupied, as computed from VEPCO records, Agent Starke *207 calculated the gross receipts of the trailer park for the years 1965 through 1969. In his calculation he used $40 as the average rent per lot. Agent Starke also reconstructed gross receipts from the Colony Motel by the linen expense method. In this calculation he used the same estimate of daily linen expense as with the other motels ($1 per room) and an estimated room rent of $10 per day. Respondent's agents also computed a small amount of additional income to the motel from telephone charges to guests. Based upon telephone records which indicated that extra message units were used in July and August 1967, 1968 and 1969, the agents calculated additional income using an estimated charge to guests of $.20 per call. When Agent Graubics became stymied in his investigation of the Sea Fin returns for 1971, 1972 and 1973, he also consulted VEPCO records and computed lot-months of electric service for those years. He estimated trailer lot rents for those years based on interviews with tenants and upon Sea Fin records for 1974 which were made available to him. These records included registration cards, checkbook stubs, cash receipt books, invoices and cancelled checks. Sea Fin records *208 for earlier years were probably never microfilmed by Agent Graubics, who was told that they had been destroyed in the December 9, 1975, automobile fire. Agent Graubics used the linen method to reconstruct motel gross receipts for 1971 and 1972, employing an estimate of $1.25 per day per room linen cost and $10 room rent. For the year 1973, for which there was no linen expense deduction on the Sea Fin return, gross receipts were computed from amounts shown on the motel's state sales tax returns. As is the case with Ocean Sands and Colony Corp., the records of the Colony Motel and Trailer Park are inadequate. In fact there are in evidence no records of this business which pertain to the years in issue.Respondent is clearly entitled to reconstruct by reasonable means the income of the motel and trailer park. Petitioners contend that respondent's use of the linen method of reconstruction does not accurately reflect the gross receipts of the Colony Motel. They allege that the amount deducted for linen expense includes the cost of linen for the Chaplain family and for workers who stayed free of charge at the Colony Motel while they were working on the expansion of the trailer park. *209 Petitioners did not contest respondent's estimate of the cost of linen per day or the average room rent. We are convinced that the amounts reported on the returns of Wilson and Elsie and Sea Fin do not completely reflect the gross receipts of the Colony Motel. Petitioners have furnished no evidence on this issue aside from their bare affirmations that the amounts reported are correct. Their reconstructions, based like those for Ocean Sands and Colony Corp., on estimates of occupancy rates and room rents, are entitled to little weight. Although, with regard to the two other motels, we found respondent's comparable method of reconstruction more convincing than the linen method, we have no evidence on which to base a similar reconstruction for the Colony Motel. Under the circumstances we do believe the linen method is a reasonable means of reconstruction. Doing the best we can with the record we have and taking into account petitioners' contentions concerning linen use, [7] we find that the Colony Motel and gross receipts from room rents in the following amounts: *210 1966
1967
1968
1969
1971
1972
$12,127
10,647
13,449
12,347
10,000
8,492
In comparison, the following amounts were asserted by respondent: 1966
1967
1968
1969
1971
1972
$18,190
15,970
20,170
18,520
10,000
12,740
Since there was no linen expense deduction for 1973, respondent based his reconstruction on the gross receipts reported for state sales tax purposes. Petitioners' reconstruction indicates more gross receipts for both 1965 and 1973 than respondent asserts. Treating the issue for those years as conceded, we find that the motel room receipts were as follows: 1965
1973
$6,300
$7,200
Petitioners contest respondent's reconstruction of telephone income for the Colony Motel. They allege that the motel phones were used by family, friends and trailer park tenants. However, they fail to explain why heavy phone use occurred only in the months of July and August, the peak occupancy period for the motel. Although Elsie testified that by the time of trial all telephones had been removed from the rooms of the Colony Motel, she did not give any indication when this removal had taken place. *211 Nor did she flatly state that no charges were made in the years in issue to motel guests for telephone use. We conclude that respondent's reconstruction is reasonable and find that Wilson and Elsie had the following amounts of income from telephone charges at the Colony Motel and Trailer Park: 1967
1968
1969
$170.20
$213.20
$182.60
With respect to the number of trailer spaces which were included in the Colony Trailer Park in the years at issue, petitioners assert that ownership of the spaces was so confused as to be almost unascertainable. They contend that respondent's computations based on VEPCO records for 913 Virginia Beach Boulevard improperly included lots owned by neighboring trailer parks. They also allege that respondent's figures are without basis, since the agents never made an actual count of the trailer park spaces. However, except for the three lots owned by Mr. Sawyer (which are not contained in the VEPCO records for 913 Virginia Beach Boulevard and which were not counted by respondent in his final tally), petitioners failed to identify specifically which of the spaces attributed to them in the VEPCO records (in which the tenant's name and *212 lot number were clearly identified) were not in fact owned by them. Petitioners have established, through the testimony of the city revenue officer who made a count of trailer lots for license tax purposes, that the trailer park and 144 spaces in late February or early March 1964. [8] The only other proof offered by petitioner as to the number of spaces was the testimony of various witnesses who estimated the size of the trailer park at different times.
The Court has analyzed the VEPCO records independently of respondent's summaries of them. We find that the records show that as of March 1964 the power company provided service to 149 trailer lots at 913 Virginia Beach Boulevard. Although the VEPCO records in evidence included some information for other addresses on Virginia Beach Boulevard, we have attributed them to trailer parks other than the Colony.Our total of 149 does not include any spaces in those other parks or the three lots owned by Mr. Sawyer.The accuracy of these records and our interpretation of them is roughly corroborated by petitioners' evidence *213 (the testimony of the city revenue officer) that the Colony Trailer Park contained 144 spaces at that time. According to our analysis, the VEPCO records also clearly indicate that new service was provided to at least the following number of spaces in the Colony Trailer Park through the years: [9]
[10] 1964 1965
1966
1973
61
35
1
15
This schedule of expansion of the trailer park was confirmed by the testimony of the electrician who has done all the work on the park since 1968 or 1969. He stated that except for the 15 "B" series of lots (which the records show were first serviced in 1973), there was no significant expansion of the park during the years he worked there. We find unpersuasive the general estimates of other witnesses as to the number of spaces added through the years. VEPCO records indicate that in 1974, service was provided to 273 spaces. Again, this figure is generally corroborated *214 by the Colony Trailer Park cash receipt book for 1974 which, according to respondent's summary, shows that rents were collected for 264 of these spaces, plus one space for which VEPCO records indicate no electricity was provided. The cash receipt book also confirms in a general way the names of occupants and dates of occupancy which appear in the VEPCO records. The correspondence between the trailer lot numbers listed in petitioners' own cash receipt book and those contained in the VEPCO records for 913 Virginia Beach Boulevard throughout many of the years in issue supports our conclusion that the VEPCO records we have used contain few, if any, trailers which were not part of the Colony Trailer Park. We conclude that the VEPCO records are reliable and are the best evidence of the number of spaces in the Colony Trailer Park, especially in the light of the incompleteness of petitioners' other books and records. Because we believe that the VEPCO records for 913 Virginia Beach Boulevard do not include more than five lots which were not part of the Colony Trailer Park, we also believe that the records accurately indicate the number of lot-months for which electric service was provided. *215 However, as petitioners point out, rents were not necessarily collected for all the lot-months that electricity was supplied. Occasionally trailer park tenants, who were often military personnel subject to transfer, would abandon their trailers or otherwise default on their purchase payments, leaving their rent unpaid as well. Electric service might remain connected for a period of months. In such situations the finance company could foreclose on the trailer, but the trailer park could often do nothing to recover the unpaid rent. Petitioners also contest the accuracy of the average monthly rents employed by respondent in his reconstructions. Rental rates for spaces did vary according to the length of time the tenant had been there and the types of services provided to him. Petitioners presented two witnesses who testified as to the rents they paid in different years. Respondent based his estimates on a figure used in work papers for 1966 allegedly prepared by Mr. McPherson, on the cash receipt book for 1974, and on the testimony of a former resident. Respondent also relied on statements by Wilson and Elsie in 1965 to a bank loan officer that the trailer park rents averaged *216 $40 per month. We believe that the VEPCO records, which show the number of lot-months for which service was provided, provide a reasonable basis upon which to reconstruct income. We do not believe this method is made unreasonable because of respondent's failure to make an actual count of the spaces at the trailer park. The record supports respondent's allegation that his agents were prevented by the Chaplains from personally inspecting the premises. In any event, a physical count of spaces during the investigation would not indicate the size of the park during earlier years. Taking all these factors and conflicting evidence into account (including extra trailer lots and other rental units included in respondent's worksheets of lot-month figures), we make the following findings: COLONY TRAILER PARK
1965
1966
1967
1968
Lot-months of
rent collected
2,376
2,056
1,691
1,418
Average rent per
lot-month
$38.00
38.00
40.00
40.00
Gross receipts
$90,288.00
78,128.00
67,640.00
56,720.00
1969
1971
1972
1973
Lot-months of
rent collected
1,583
2,676
2,525
2,799
Average rent per
lot-month
40.00
50.00
53.00
55.00
Gross receipts
63,320.00
133,800.00
133,825.00
153,945.00
*217 All of our findings with respect to the Colony Motel and Trailer Park are summarized in the table below, which includes, for comparison, some of the figures proposed by the parties. COLONY MOTEL AND TRAILER PARK -- TOTAL GROSS RECEIPTS
WILSON & ELSIE
1965
1966
1967
1968
1969
FINDINGS OF
THE COURT
$96,588.00
90,255.00
78,457.20
70,382.20
75,849.60
PARTIES'
CONTENTIONS
Per petitioners'
returns
$63,559.00
53,209.16
43,048.50
52,236.85
57,986.00
Per statutory
notice
$116,780.00
111,630.00
93,221.20
83,063.20
89,262.60
SEA FIN
1971
1972
1973
FINDINGS OF
THE COURT
143,833.00
142,317.00
161,145.00
PARTIES' CONTENTIONS
Per petitioners'
returns
137,190.27
131,727.00
152,301.00
Per statutory
notice
173,515.00
167,070.00
175,093.00
II. BUSINESS DEPRECIATION--FINDINGS OF FACT AND OPINION
Kona Kai (Ocean Sands) and Kona Kai East (Colony Corp.)
Petitioners have acknowledged that the bases for depreciation of the motel structures claimed on their returns were erroneously determined from appraisals rather than from cost figures. It is not necessary to dwell upon *218 the explanation for these errors since the depreciation deductions in question are not a part of respondent's fraud allegation. On their respective returns, petitioners Ocean Sands and Colony Corp. claimed a $425,000 basis for the Kona Kai and a $708,622 basis for the Kona Kai East. The returns used a 3% straight line rate of depreciation. In the notices of deficiency respondent adjusted the Kona Kai basis to $204,600 and disallowed the Kona Kai East depreciation in full. At the trial, the purported actual cost of the two motels was laboriously reconstructed by petitioners largely on the basis of Chappy's memory and research performed shortly before and during the trial. Petitioner's reconstructed cost figures totaled $301,000 for the Kona Kai and $473,622 for the Kona Kai East. Chappy and others also testified at considerable length as to the relatively short useful life of various components of these oceanfront motels. This was done to convince the Court that these motels should be depreciated at a 4% annual rate rather than 3% as shown on the returns. If the Court were to accept the reconstructed figures and apply the 4% rate, the annual depreciation for Kona Kai would *219 be $12,040 and for Kona Kai East, $18,944.88. The annual amounts claimed on the returns were $12,750 and $21,259, respectively (for full years in service.) The $21,259 figure claimed for Kona Kai East included furnishings. The Court is persuaded (as was respondent, as reflected in his brief) that the actual cost of the Kona Kai exceeded the amount of $204,600 determined in the notice of deficiency. In the absence of records, we have weighed the testimony of Chappy against the local property tax assessed valuation, the amount of financing, and other elements contained in the record herein. Under the circumstances we feel warranted in applying the rule of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930) to this item. Cohan cautions us to bear heavily [11] against the taxpayer "whose inexactitude is of his own making." Accordingly, we find that the cost basis of the Kona Kai was $270,000. *220 With respect to the Kona Kai East, respondent on brief expresses the belief (based upon petitioner's representations made to Virginia National Bank and upon property tax assessed valuation) that the actual cost was $416,000, as opposed to Chappy's reconstructed $473,622 cost. Weighing the opposing contentions, and in accordance with our overall evaluation of the record herein, we find that the cost basis for depreciation of the Kona Kai East was $450,000. We are unwilling to accede to petitioners' contention that the rate of depreciation of these motels should be increased from 3% (claimed on their returns) to 4%.We believe that this contention is prompted largely by the recognition of and the desire to compensate for petitioners' acknowledged errors in basing depreciation on appraised values rather than cost. Although it has long been held that the opinion of a knowledgeable corporate officer may be given some weight in establishing valuation of corporate assets ( The Winter Garden, Inc. v. Commissioner,10 B.T.A. 71 (1928)), such weight may be tempered by the circumstances, including (as true herein) a change in position at trial from that taken on the tax *221 return. See Leonard Refineries, Inc. v. Commissioner,11 T.C. 1000, 1008 (1948). Moreover, petitioners used composite depreciation accounting on their returns, and we would not be justified in reducing the useful life of the total structure because of the claimed injurious effects of the oceanfront elements upon certain of the components.Petitioners offered no expert testimony, and we are not convinced that the depreciation rate reflected on petitioners' returns was an incorrect one. We find and hold that the 3% rate used by petitioners on their returns was the proper rate of depreciation. The parties are likewise in conflict as to the cost of furnishing the Kona Kai and Kona Kai East.(However, there is no dispute as to the 10 year useful life petitioners have claimed with respect to furnishings.) Petitioners claimed such cost in the amount of $60,000 for the Kona Kai. As to the Kona Kai East, the furnishings were not claimed separately and were blanketed in the $708,622 appraised value figure referred to above.Respondent's notice of deficiency to Ocean Sands reduced the $60,000 Kona Kai furnishings figure to $40,000, and the notices to Colony Corp. disallowed *222 all claimed depreciation for the Kona Kai East. At trial, petitioners sought to establish a $57,850 cost figure for the Kona Kai East furnishings as well as to sustain the claimed $60,000 figure for the Kona Kai. On brief respondent agrees that the record would support a finding of $45,700 cost of Kona Kai furnishings and $46,184 cost of Kona Kai East furnishings. With respect to Kona Kai, an undisclosed portion of the alleged $24,000 carpeting cost represented carpets saved for use in the addition to the motel which was not completed in the years at issue. Taking this fact into account and also taking into account that the claimed furnishings' costs (approximating $60,000) were reconstructed figures, the Court finds that the cost of the depreciable furnishings of the Kona Kai was $48,000. As to the Kona Kai East respondent agrees on brief that the testimony on petitioners' behalf was more accurate, but respondent asks the Court to reduce the claimed $57,850 furnishings figure by $11,666, which represents the cost of carpet and drapes in the penthouse. We have determined below (see page 125) that Wilson and Elsie were not required to live in the penthouse and that the value *223 of its use as lodging is taxable to them as a dividend. We likewise conclude that petitioners have failed to prove that the use of the penthouse by Wilson and Elsie or anyone else was non-personal in nature and hold that the depreciable cost of the Kona Kai East furnishings was $46,184. Colony Motel and Trailer Park and Service Station (Wilson and Elsie, and Sea Fin)
On their individual returns, commencing in 1965, Wilson and Elsie claimed a $90,000 cost for the Colony Motel (acquired in 1957), $5705 for a 1965 building addition, $35,000 for the service station building (acquired in the mid-1950's) and $10,000 for the service station equipment. [12] The individual returns, commencing in 1968, also claimed depreciation on $32,000 in trailer park improvements acquired, as reported, in 1961. Additionally, the returns claimed depreciation on furniture, air conditioners and television sets, with an aggregate cost of $22,000 (per returns), a reported 1957 acquisition date, and 10-year useful life. These latter items were depreciated on the individual returns through 1967. *224 Respondent adjusted the depreciation for lack of substantiation of cost but did not assert fraud on any of the depreciation issues. As to the individual returns from 1965 through 1969, respondent reduced the motel cost from $90,000 to $64,040; the 1965 addition was reduced from $5705 to $1000; the service station was reduced from $35,000 to $17,380, and its equipment was reduced from $10,000 to $8000. No depreciation was allowed by respondent on the claimed $32,000 cost of trailer park improvements. The aggregate cost of the furniture, air conditioners and television sets was reduced from $22,000 to $16,133, but respondent treated these items as having been fully depreciated by 1965. Additionally, respondent corrected a mathematical overstatement of 1969 depreciation on a dump truck. As to 1971, respondent likewise reduced the claimed $35,000 cost basis of the service station to $17,380, notwithstanding respondent's claim that the January 11, 1971, transfer of that property to Sea Fin was a taxable sale.(See page 97 et seq.) The Sea Fin returns, for 1971 through 1973, claimed the same cost bases as did the prior individual returns. However, commencing in 1971, Sea Fin added *225 the item "sewer line to park," which it claimed was acquired in 1967 [13] at a cost of $30,000. In 1973 Sea Fin added the item "automotive equipment," claimed to have been acquired in 1973 at a cost of $37,909. Other miscellaneous depreciable items were added in the 1973 return, including washers and dryers, a fence, carpets, trailer park improvements, furnishings and fixtures. Respondent, as with Wilson and Elsie's return, adjusted Sea Fin's claimed depreciation for lack of substantiation as to cost figures. Respondent's computations show an acquisition date of January 1971 (consistent with respondent's position that a taxable transfer of assets took place at that time). Commencing with 1971, respondent reduced the depreciation bases of the motel building to $25,115; the building addition to $662; the pick-up truck to $750; and the dump-truck to $1305. Respondent allowed no depreciation on the claimed $32,000 trailer park improvements, the claimed $30,000 sewer line to park, or (as to 1973) the claimed $37,909 automotive equipment. *226 Respondent's cost figure adjustments on the motel building are unexplained in the record. They do not correspond to prior years' adjustments, nor do they tie in with the alleged consideration received on the property transfers to Sea Fin. There was no explanation of respondent's failure to allow any depreciation on the trailer park improvements, the sewer line, and the automotive equipment, other than lack of substantiation, coupled with the statement by Revenue Agent Graubics at trial that "the Cohan rule went out a long time ago." The only major improvement to the trailer park which was done under contract with an outside party was a roadpaving job in early 1972 performed by Ames & Webb for which Sea Fin paid $29,010.58. This item appears as an ordinary expense deduction on Sea Fin's returns for 1971. However, all payments on that contract were made in 1972, except for $5000 paid in 1971. On brief, respondent conceded that Wilson and Elsie have substantiated their cost in the service station and equipment and "are entitled to the rental depreciation claimed on their income tax returns in the amount of $2400 for each of the years 1968, 1969, and 1971." Actually the returns *227 claimed only $1400 depreciation in those years on the service station building itself, since the equipment had been fully depreciated in 1967. On the other hand, respondent's concession that costs have now been established should apply with equal force to 1965 and 1966, when the petitioners claimed the full $2400 depreciation on the service station building and the equipment. On brief, respondent also conceded the claimed $30,000 cost and $1500 annual depreciation of the sewer line (even though such cost was undocumented.) Respondent further conceded the $29,010.58 paving expenditure in 1971 but asserts that it should have been capitalized over at least eight years. As was also true with respect to most of the deductions involved in these cases, the testimony on petitioners' behalf as to the original costs of the Colony Motel and addition was nothing more than a bare affirmance of the correctness of the figures on the returns.Petitioner had the burden of proof on depreciation, as well as the other miscellaneous expenses. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners' bare assertion that the returns *228 were correct does not satisfy that burden. Halle v. Commissioner,7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949), cert. denied 338 U.S. 949 (1950). We accordingly sustain respondent's determinations for the years 1965 through 1969 with respect to the costs of the Colony Motel and building addition. However, consistent with our determination below (see page 105) that the 1971 transfer of these properties to Sea Fin was tax-free under section 351, we hold that the unadjusted depreciation bases of these properties were the same for 1971 and subsequent years as determined for the preceding years. See section 362, I.R.C. 1954. As to the service station, we hold (consistently with respondent's concessions at trial and in his brief) that petitioners are sustained in the amounts of depreciation claimed (but not in any greater amounts) for all years at issue. With respect to the $32,000 claimed as trailer park improvements, assertedly acquired in 1961 (and first reported by petitioners in 1968), petitioners' evidence persuades us only that some costs were incurred in the basic improvements to the trailer park and that (because the materials *229 were obtained cheaply and the labor was furnished mainly by family members) such costs were very low. Applying the rule of Cohan v. Commissioner,supra, we hold that the original cost of such improvements was $14,000 (rather than the $32,000 claimed on the returns) and that such cost was depreciable over a 20 year life as claimed on the returns. As to the $29,010.58 paving expense (which respondent now concedes as a 1971 expenditure), the Court agrees that this item must be capitalized rather than deducted in the year it was allegedly paid. On the basis of the evidence, and again taking into account the imprecision of that evidence, we hold that the useful life of the paving was five years and that its cost should be depreciated over that period rather than deducted as an expense in 1971. From the fact that most of the expense was paid in 1972 and from information on the final invoice for the paving job, we conclude that the newly paved road was put in service in 1972. The first year for which a depreciation deduction is allowed is therefore 1972. See section 1.167(a)-10(b), Income Tax Regs.
With respect to all other depreciation adjustments pertaining *230 to the ColonyMotel and Trailer Park, both on the individual returns of Wilson and Elsie and on the corporate returns of Sea Fin, there is a lack of credible evidence in the record to rebut the presumption of correctness of respondent's determinations. The Court accordingly sustains all such determinations except as hereinabove modified. [14]
III. miscellaneous business expense deductions--findings of fact and opinion/
General statement
Because of the alleged absence of records, the petitioners' "proof" of expenses consisted *231 mainly of testimony from Suzanne, Chappy, and Elsie. This testimony constituted to a very large extent either bare affirmances of the correctness of the figures shown on the returns, or affirmanfces of such figures based upon claimed recollections or reconstructions generated at family conferences during the course of the trial or shortly before trial, which, quite clearly, were calculated to coincide with the return figures. In most instances the recollections or reconstructed figures were identical or nearly identical with the amounts on the returns. It has long been established that mere reaffirmance of the correctness of tax returns is not sufficient evidence to rebut the presumption of correctness of respondent's determinations. Halle v. Commissioner,supra; Roberts v. Commissioner,62 T.C. 834, 839 (1974); Geiger v. Commissioner,440 F.2d 688 (9th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court, cert. denied 404 U.S. 851 (1971). But it does not follow, because a reconstructed figure coincides with the return figure, that it is ipsofacto wrong. It is our view that in instances where *232 the Court has been persuaded by the testimony that claimed expenses have been sufficiently matched with specific persons, places or purposes, the Court is justified in applying the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). In such cases, in the absence of records, we are cautioned to bear heavily against the taxpayer. We will specify below those instances in which we think the Cohan rule may properly be applied, as well as any other expense items which, we feel, respondent erroneously disallowed. Although we believe that each of the expense deduction issues is dealt with below, the Court holds that any disputed expense disallowance which may not specifically be mentioned below is sustained on the basis of the above-cited Halle,Roberts and Geiger cases. [15] In addition, we sustain any additional expense deductions allowed by respondent in excess of the amounts shown on petitioners' returns. *233 Kona Kai (Ocean Sands)
The expenses of Ocean Sands disallowed in the notices of deficiency were as follows: Expense Deductions Disallowed--Ocean Sands
1968
1969
1971
Legal fees
$ 2,919.40
$ 485.88
Cleaning & repairs
$14,452.86
$12,300.00
(maintenance)
Rents
$ 2,500.00
$2,500.00
Taxes expense
$4,139.80
Interest expense
$4,500.00
Insurance expense
$1,050.00
Cleaning supplies
$ 856.15
Repair expense
$18,108.30
Linen expense
$7,490.81
Automotive expense
Food for restaurant
Advertising expense
1972
1973
Legal fees
$ 603.8
Cleaning & repairs
(maintenance)
Rents
$2,500.00
$2,500.0
Taxes expense
$1,405.34
Interest expense
$3,000.00
$1,630.3
Insurance expense
$ 770.00
Cleaning supplies
Repair expense
$ 151.9
Linen expense
$ 255.7
Automotive expense
$1,799.35
$1,821.3
Food for restaurant
$4,765.82
Advertising expense
$ 795.41
Legal fees. Respondent stipulated at trial that $400 of the claimed $2,919.40 legal fees in 1968 qualified as a deductible expense. All but $50 of the balance of the 1968 fee, the entire 1969 fee and all of the *234 1973 fee were paid to Stanley Sachs, an attorney, for representation in court proceedings growing out of altercations which took place on the Kona Kai premises, in which various family members were among the participants.As we read the parties' stipulation on this score, Ocean Sands was (along with the involved family members) one of the parties so represented in such litigation. We believe that Pantages Theatre Co. v. Welch,71 F.2d 68 (9th Cir. 1934), and the other cases cited to us by respondent are inapposite because they were decided prior to Commissioner v. Tellier383 U.S. 687 (1966). We feel that the record as a whole justifies us in finding that the altercations in question grew out of efforts on the part of the involved family members (misguided as they may have been in some situations) to protect and further the business interests of Ocean Sands.Although not entirely free from doubt, we hold, under the authority of Tellier, that except for the $50 in 1968 (as to the purpose of which no evidence was introduced), the disputed legal expenses were deductible as ordinary and necessary business expenses. Cleaning and repairs. Included *235 in the amounts disallowed for 1968 and 1969 were the amounts (estimated by petitioners) of $8000 and $10,000, respectively, representing the cost of replacing green lumber used for beams in the 1966 and 1967 construction. The beams had started to sag by 1968. Because this occurred so soon after the original construction, we hold that the beam replacement was an integral part of the original construction and must be capitalized as part of the cost of the structure. Driscoll v. Commissioner,147 F.2d 493 (5th Cir. 1945). [16] Under the rule of Cohan,supra, the Court sustains the petitioners as to 50% of the balance of the claimed 1968 and 1969 expenditures under this heading. Rents. Ocean Sands paid $2500 to Sea Star in each of the years 1969 through 1973 for necessary additional parking space. Although the payments were loosely handled, the Court is persuaded that the said amounts were indeed paid, were reasonable in amount, and are deductible as ordinary and necessary expenses of Ocean Sands for the years at issue. Interest expense *236 . Respondent has conceded on brief that Ocean Sands is entitled to deductions for 1971, 1972 and 1973 in the respective amounts of $4500, $6586.66 and $3302.49, over and above the amounts allowed in the notices of deficiency. Such concessions will be given effect in the Rule 155 computation in these cases. Linen expense. On its 1971 return Ocean Sands deducted $16,738.29, and respondent disallowed $7,490.81 of that amount. However at trial petitioner conceded that because of a clerical error, the deduction was overstated by $10,000. Accordingly we allow a deduction of $6,738.29 for 1971. All remaining expense items. As to all remaining Ocean Sands expense adjustments set forth in the above schedule for the years 1971, 1972 and 1973 (including all items set forth in the notices of deficiency in which respondent increased the amounts claimed as deductions on the returns), we note that in contrast to his total disallowance of Sea Fin expenses (see page 81, infra), respondent allowed Ocean Sands deductions to the extent substantiated. In these circumstances, and in view of the fact that the testimony amounts to little more than bare affirmance o the figures shown *237 on the returns (see Halle,supra), we do not feel warranted in applying the rule of Cohan,supra.Accordingly, as to all such remaining items, there being no credible evidence in the record to rebut the presumption of correctness of respondent's determinations, we sustain those determinations. Included in this holding is respondent's allowance of additional depreciation for repair expense items disallowed and capitalized for the year 1971. Kona Kai East (Colony Corp.)
The expenses of Colony Corp. disallowed in the notices of deficiency were as follows: Expense Deductions Disallowed--Colony Corp. 1972
1973
Salary expense
$6,815.57
Repair expense
$2,916.79
$3,158.46
Taxes expense
6,636.17
Interest expense
$19,575.00
$12,380.00
Professional fee expense
$ 854.00
Insurance expense
$1,540.00
Operating equipment expense
$7,780.00
Salary expense for 1972. The respondent disallowed $6815.57 of the claimed $8205 deduction. The Court is satisfied that expenses for maid service and other services not chargeable to the construction costs of Kona Kai East were paid during 1972 in excess of $1389.43 *238 allowed by respondent. In view of the lack of records and the inexactitude of the testimony, this Court believes the rule of Cohan,supra, should be applied to this item. The Court accordingly concludes that $3000 additional allowance should be made for this item and that it is deductible for 1972 as an ordinary and necessary business expense. For 1973 respondent has allowed more than the amount claimed on the return. This additional allowance as well as other additional allowances set forth in the notices of deficiency will be given effect in the Rule 155 computations in these cases. Taxes expense for 1972. Respondent disallowed $6,636.17 of $11,113 taxes expense claimed on the return. Petitioners' evidence included proof that in 1972 more than $16,000 was paid out of loan proceeds by First Colonial Bank for property taxes, penalties and interest. We cannot tell how much of these payments was allocable to penalties or to "interest" which might have been in the nature of a penalty and which accordingly would not constitute a deductible "tax" under section 164 of the Code.[17] Colony Corp. had acquired the properties in 1961 and of the total amount *239 proven, over $10,000 was attributable to the years 1962 to 1968. Some of the remaining amount of taxes, penalties and interest so proven was attributable to the years 1969 through 1971. We are left in the dark as to how to apportion these payments. With the record as it is, and in view of the fact that respondent increased Colony Corp.'s tax deduction for 1973 by $7452.24 (likewise unexplained in the record), we find ourselves unable to disturb respondent's determinations as to these items. Accordingly we sustain such determinations. Interest expense. Respondent has conceded on brief, and we accordingly hold, that Colony Corp. is entitled to deduct interest for 1972 and 1973 in the respective amounts of $19,975 and $11,475 over and above interest deductions allowed in the notices of deficiency. Professional fee expense for 1972. Petitioner deducted $1800 paid for legal fees in connection with the $300,000, ten year loan for construction of the Kona Kai *240 East.Respondent allowed $946 of the deduction and disallowed the rest. We hold that the remaining $854 should be amortized over the period of the loan. See Lovejoy v. Commissioner,18 B.T.A. 1179 (1930). The Court expects the parties to take this determination into account in their computation under Rule 155. All remaining expense items. In the absence of any persuasive evidence to the contrary, we sustain the remaining adjustments with respect to Colony Corp.'s expense deductions (including respondent's allowances of depreciation on capitalized items). Colony Motel and Trailer Park, and Service Station (Wilson and Elsie, and Sea Fin)
The expenses of the Colony Motel and Trailer Park disallowed in the notices of deficiency were as follows: Expense Deductions Disallowed--Colony
Motel and Trailer Park, and Service Station
1965
1966
1967
1968
Repairs
$4,458.76
$3,988.59
$2,828.40
$3,875.24
Rents
$5,500.00
Repaving expense
Management fee
or commission
Clerical & supervisory
fee
Sundries expense
Supplies
Legal fee
expense
Interest expense
Auto expense
Miscellaneous
expense
Professional fee
expense
Other rental
expenses
*241 1969
1971
1972
1973
Repairs
$8,919.75
$15,534.70
$16,347.90
$35,904.00
Rents
$3,000.00
$ 3,000.00
Repaving expense
$29,010.58
Management fee
$13,719.03
$ 6,000.00
$21,000.00
or commission
Clerical & supervisory
$ 5,200.00
$15,000.00
fee
Sundries expense
$ 6,724.98
Supplies
$ 3,725.47
$16,055.86
$ 1,668.00
Legal fee
$ 475.00
$ 1,650.00
fexpense
Interest expense
$ 770.00
$ 1,867.00
$ 849.00
Auto expense
$ 3,421.31
$ 3,731.00
Miscellaneous
$ 3,688.00
expense
Professional fee
$ 1,365.00
expense
Other rental
$ 2,148.79
expenses
Repairs. The Court finds no evidence in the record to rebut respondent's partial disallowances for the years 1965-1969. As to 1971-1973, respondent disallowed the Sea Fin repairs items in the full amounts claimed.Under the rule of Cohan, supra, and based upon the record as a whole, the Court finds that Sea Fin is entitled to repairs deductions for 1971-1973 in the amounts of 50% of the deductions claimed on the returns for those years. Rents. The Chaplains in 1968 and 1969 and Sea Fin in 1972 paid $3000 rent to *242 Chattel. In 1968 $5500 was claimed by the Chaplains as a rent deductions, apparently including an added $2500 paid to Sea Star. There is no question that Chattel and Sea Star were separate corporate entities, that the lots on the oceanfront were owned by those corporations, and that such lots were made available to the Colony Motel and trailer park guests and tenants for ocean bathing access. Although the rental payments were handled in the usual loose way in which the Chaplains handled many of their financial transactions, the Court is satisfied that such rents were paid, were reasonable in amount, and are deductible as ordinary and necessary business expenses under section 162. Repaving expense.As set forth in the business depreciation findings and opinion herein, (see page 68, supra) the $29,010.58 claimed expense will be disallowed, and that amount will be depreciable over a five year period. Management fees and clerical and supervisory fees. Respondent disallowed these items in full. The Court is satisfied that each of these fees for the years 1971, 1972 and 1973 was paid by Sea Fin to Elsie or Suzanne, that they performed substantial services for Sea Fin, *243 and that the amounts involved are not unreasonable.Respondent has not pleaded the applicability of section 482 of the Code to the possible allocation of any such salaries or fees to other controlled corporations. The claimed deductions for such services are accordingly allowed in full. Sundries expense and supplies. These items were likewise disallowed in full by respondent. On the basis of the record in its entirety, the Court is convinced that some portion of the claimed expenses is allowable under the rule of Cohan, supra.We hold that 50% of the amounts claimed for each of the said items is properly deductible under section 162, except that with respect to the $16,055.86 supplies expense claimed in 1972, only 20% is deductible. It may be that some portion of the remaining balance of this claimed expenditure represents a depreciable asset in Sea Fin's hands. However, there is no evidence in the record which would support a finding as to the cost basis of such asset. In reaching these conclusions we have again taken into account the complete lack of records, and the weakness of other proof, coupled, however, with our conviction that some approximation *244 is justified under the record as a whole. Legal fee expenses. The disallowed legal fees were incurred for the organization of Sea Fin in 1971 and for defense of title in litigation in 1972.These clearly were capital expenditures and the disallowances by respondent are sustained. See section 1.263(a)-2, Income Tax Regs. and section 248 of the Code. Interest expense. Petitioners could have attempted some corroboration of the 1971, 1972 and 1973 interest items. In the absence of any proof, other than affirmation of the returns, respondent's disallowances are sustained. Auto expense. Again respondent disallowed the claimed 1972 and 1973 expenses of Sea Fin in toto. We are convinced that some such expenses are allowable, and under the Cohan rule, our best approximation is that 50% of such claimed expense constituted ordinary and necessary business expenses and should be allowed in each of these years. We so hold. Miscellaneous expense. No proof was offered on this $3688 item (which was disallowed for 1973).We sustain respondent's determination. Professional fee. This item, claimed for 1973, totaled $1365. Of that amount, $1000 was the balance *245 due on legal fees, referred to above, for defense of title, and accordingly improperly claimed as a deduction.The $365 balance was paid by Sea Fin for accounting services, and is deductible as an ordinary and necessary business expense. Other rental expense for 1971. In reporting the income from the service station for 1971, Wilson and Elsie claimed "other expenses" (in addition to depreciation) totaling $2148.79 and consisting of interest ($868.12), taxes ($1035.67) and insurance ($245). Respondent disallowed these amounts in toto. We find that valid expenses were incurred in the production of the rental income from the service station. In the absence of records as to the amount of such expenses, we apply Cohan, supra, and hold that out of the claimed total of $2,148.79, petitioners are entitled to deduct $1000. Sea Star and Chattel
In the case of Sea Star and Chattel Corporations, the items of disallowance consist of tax expense in the years 1971 through 1973 for Sea Star and 1971 and 1972 for Chattel, and interest expense for each corporation in 1971. The record is devoid of any proof as to these items, and we have no alternative but to *246 sustain respondent's determinations. IV. NET OPERATING LOSS DEDUCTIONS--FINDINGS OF FACT AND OPINION
Kona Kai (Ocean Sands)
Respondent adjusted Ocean Sands' net operating loss carryover from 1965 and 1966, claimed on the 1967 return in the amount of $19,053.95. Respondent accepted the claimed net operating loss of $4,285.20 for 1965 but reduced the 1966 loss to $9,370.35. Accordingly, respondent disallowed the loss carryover deduction for 1967 to the extent of that 1966 reduction ($5398.40). Net operating loss deductions were also claimed by Ocean Sands for 1968 and 1971.The deduction claimed for 1971 in the amount of $68,963.46 included in part a claimed 1970 net operating loss. The year 1970 is not at issue here, but respondent contends that full disallowance of the claimed carryover to 1971 is justified by a recomputation of Ocean Sands' 1970 net income based upon reconstruction of that year's gross receipts by the comparable motels method used in other years. Petitioner Ocean Sands has introduced no evidence establishing the losses which it carried over from 1965, 1966 and 1970 (other than the tax returns and such proof as exists in the record as to weaknesses *247 in respondent's methods of reconstructing gross receipts). We cannot conclude that Ocean Sands incurred such losses merely from the fact that its returns reflected losses. The fact that the government may have accepted or acquiesced in the returns for years not at issue does not relieve petitioner from its burden of proof as to actual existence and amount of the losses sought to be carried over. [18] It is our view, nevertheless, that respondent should be required to recompute the 1970 net operating loss of Ocean Sands, taking into account this Court's determination that the Kona Kai had an average of 40 rooms available for rent in 1970 and that it had gross receipts of $123,216 that year. [19] Subject to that exception, and in the absence of proof, we sustain respondent's determinations as to Ocean Sands' net operating loss deduction. *248 Sea Star and Chattel
For 1971, 1972 and 1973 Sea Star claimed net operating loss deductions of $16,751.62, $14,419 and $9830, respectively. For 1971 and 1972 Chattel claimed net operating loss deductions of $22,531 and $4318, respectively. Respondent disallowed all such deductions in full. There is complete absence of proof on these claimed deductions and we must accordingly sustain respondent's determinations. V. FRAUD PENALTIES, CORPORATE PETITIONERS (OCEAN SANDS, COLONY CORP., AND SEA FIN)--FINDINGS OF FACT AND OPINION
Respondent contends that at least a part of the deficiencies in income tax of Ocean Sands and Sea Fin in 1971 through 1973, and of Colony Corp. in 1972 and 1973, was due to fraud with intent to evade tax within the meaning of section 6653(b). [20] In his answers respondent alleges as his basis for fraud that gross receipts were understated, that adequate records were not maintained, and that petitioners produced incomplete records in response to respondent's requests. Respondent has not affirmatively alleged fraud in connection with overstated deductions. *249 The burden of establishing fraud, by clear and convincing evidence, is upon respondent. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Foster v. Commissioner, 487 F.2d 902, 903 (6th Cir. 1973), affg. a Memorandum Opinion of this Court; Fox v. Commissioner, 61 T.C. 704 (1974). To establish fraud the Commissioner must show that the taxpayer intended to evade taxes, which he knew or believed he owed, by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958). However, in sustaining his burden of proof, respondent is not required to prove the precise amount of the underpayment resulting from fraud, but only that "any part" of the underpayment is attributable thereto. See Estate of Brame v. Commissioner, 25 T.C. 824 (1956), affd. per curiam 256 F.2d 343 (5th Cir. 1958). The presence or absence of fraud is a factual question to be determined by an examination of the *250 entire record. Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). Since fraud can seldom be established by direct proof of intention, the taxpayer's entire course of conduct can often be relied on to establish circumstantially such fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra.A corporation, of course, acts through its officers and authorized employees. Considering the entire record, we conclude that respondent has proven that a part of each of the deficiencies of Ocean Sands for 1971 through 1973 and of Colony Corp. for 1972 and 1973 was due to fraud. The basic factor which indicates fraud is a consistent pattern of substantial understatement of gross receipts by these petitioners.(See tables at page 39.) According to our findings, Ocean Sands understated its gross receipts by 16% in 1971, 27% in 1972 and 14% in 1973. Colony Corp. understated its gross receipts by 38% in 1972 and 28% in 1973. When all the *251 years at issue in these consolidated cases are considered, there appears a pattern of understatement of gross receipts for six years in the case of Ocean Sands and two years in the case of Colony Corp. Both of these businesses were operated by the same individuals. The officers of petitioners (Ocean Sands and Colony Corp.) must have known that they were underreporting income. Thus, operating statements of Ocean Sands for 1972 and 1973, which were signed by Suzanne as president of the corporation and presented to creditors or potential creditors, show gross receipts of nearly twice the amounts reported on the tax returns for those years, which were also signed by Suzanne. See Romm v. Commissioner, 245 F.2d 730 (4th Cir. 1957), cert. denied 355 U.S. 862 (1957). In addition, the amounts reported on the returns were frequently not sufficient to cover both the expenses reported and the debt reduction payments of principal which were made by Ocean Sands and Colony Corp. (See table at page 36.) We cannot accept petitioners' story that money to cover the shortfall consistently came from Wilson. Aside from the fact that Elsie invested in the family business *252 the proceeds of gifts from her father-in-law, the standard answer at trial, when a question was raised as to source of funds, was that Wilson had loaned the money. We find it incredible that the need for cash over the years at issue was satisfied solely or primarily by Wilson. It is our view that at least a substantial part of the apparent cash flow deficit was illusory. There is no evidence that it actually existed. In fact, for the most part, these years were times of apparent prosperity during which additional expansion and building was planned and carried out. Under such circumstances we are convinced that the underreporting of income was intentional. Although mere understatement of income, standing alone, is not sufficient to carry respondent's burden of proof, a consistent pattern of substantial and intentional underreporting is by itself strong evidence of fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. See also Holland v. Commissioner,348 U.S. 121, 139 (1954). Such repeated understatements, coupled with other so-called "badges of fraud," constitute clear and convincing *253 evidence that the understatements are the product of an intent to evade tax. Merritt v. Commissioner,supra;Vannaman v. Commissioner,54 T.C. 1011, 1018-1019 (1970). Petitioners' officers' refusal to cooperate with the revenue agents in their investigation is such an additional badge of fraud. See Millikin v. Commissioner,298 F.2d 830, 836 (4th Cir. 1962); Granat v. Commissioner,298 F.2d 397, 398 (2d Cir. 1962); Klassie v. United States,289 F.2d 96, 103 (8th Cir. 1961). Petitioners did not return the agents' calls, did not appear at requested meetings, and refused to produce books and records, except under threat of a court order. Even after they did produce records, petitioners continued to be uncooperative. For example, when Agent Graubics requested to see certain records a second time, he found a portion of them were missing. We have attempted in our general findings to explain some of the reasons for the non-cooperative attitude of petitioners, especially Wilson, and we have tried to the best of our ability to give due weight to those reasons in evaluating the intent of petitioners *254 for fraud purposes. Nevertheless, we are convinced the failure to cooperate was conduct intended to conceal and to prevent the collection of taxes, and therefore is an indication of fraud. See Stoltzfus v. United States, supra.
We have already determined that petitioners failed to keep complete books and records and that their bookkeeping system was wholly inadequate. Such a failure to keep records usual in business transactions is a further badge of fraud, ( Baumgardner v. Commissioner, 251 F.2d 311, 314 (9th Cir. 1957),) especially where, as here, the taxpayer knows his records are inadequate. [21]
Yet another badge of fraud in these cases is the history of repeated incidents, including a series of fires (two of which are highly suspicious), in which records were allegedly destroyed. Cf. Estate of Beck v. Commissioner, 56 T.C. 297, 365 (1971). Moreover, we are convinced that some of the records which petitioners claim were burned were not actually destroyed. For example, certain Sea Fin records, *255 allegedly consumed in the December 9, 1975, fire, and later reported to the police by Elsie as stolen, were actually in the possession of Mr. Fine, attorney for Suzanne and Chappy. Nevertheless, none of these records were produced at trial. Such inconsistent explanations of the failure to produce records are themselves indications of fraud. Gromacki v. Commissioner, 361 F.2d 727, 732 (7th Cir. 1966). Finally, the extent to which petitioners dealt in cash and the manner in which they handled the cash are further factors in our determination. See Gromacki v. Commissioner, supra. Although we have described in our general findings Wilson's aversion to banks, the emotional reasons for this aversion do not counterbalance the inferences of fraudulent intent which must be drawn from the large stockpiles of cash in the different corporate safes. Nor do such reasons outweigh the inference of fraud to be drawn from the policy of physically intermingling corporate receipts, without counting or otherwise earmarking them, in various safes with cash from other corporations. These obfuscating practices (coupled with the general custom of each of the corporations *256 of dealing substantially in cash) make it almost impossible to discern how much cash is attributable to each business and when it was received; such practices are indicia of an intent to mislead and conceal assets and sources of income. With regard to the Sea Fin returns for 1971, 1972 and 1973, we reach a different conclusion. In the case of Ocean Sands and Colony Corp., the underlying factor in our determination was a history of substantial and intentional underreporting of gross receipts. This pattern of understatement was supported by other badges of fraud as well. Although some of those badges are present in the case of Sea Fin, the underlying factor of a pattern of substantial understatement has not been established. With Sea Fin, the discrepancies between our findings and the amounts reported are relatively small in comparison with the discrepancies found with respect to Ocean Sands and Colony Corp. Recognizing the inherent imprecision in the method of reconstruction we have used, we consider the amounts reported by petitioner Sea Fin as being on the borderline of a reasonable zone of error for which we must make allowances in determining fraud, where the burden is on *257 respondent. Based upon our findings of Sea Fin's gross receipts (see page 55), Sea Fin underreported those gross receipts by 5% in 1971, 7% in 1972, and 5% in 1973. Resolving our doubts in favor of Sea Fin, we do not feel warranted under the circumstances in labeling these differences as "substantial" for fraud purposes. Accordingly, Sea Fin's case lacks a foundation for an inference of fraud. Whatever other badges of fraud may be present in Sea Fin's case (like those which bolstered a finding of fraud with respect to Ocean Sands and Colony Corp.), they are, standing by themselves, insufficient proof of fraud. We conclude that respondent has failed to carry his burden of "clear and convincing" proof with respect to the fraud penalties against Sea Fin. VI. GAIN ON TRANSFER OF REAL PROPERTY TO SEA FIN BY WILSON AND ELSIE--FINDINGS OF FACT AND OPINION
In docket no. 5976-76, respondent asserted that the joint return of Wilson and Elsie for 1971 failed to report a capital gain on the sale by Elsie of motel and trailer park land to Sea Fin. Respondent alleges that the sales price was $540,000, that petitioners had a basis of $216,000, and that they realized $323,900 gain *258 (before the 50% reduction under section 1202 of the Code). This omission is asserted by respondent both for deficiency and for fraud penalty purposes. On January 11, 1971, two deeds to Sea Fin were executed by Elsie, Wilson, and Gussie Mae Chaplain (Wilson's mother) transferring the real property occupied by the Colony Motel and Trailer Park and the Phillips 66 service station. The deeds recited a consideration of $10 and "other good and valuable consideration." No other assets appear to have been transferred to Sea Fin on its original incorporation. On January 15, 1971, a deed of trust was executed by Sea Fin to Melva v. Baugh (Wilson's sister) as trustee with power of sale. This deed of trust purportedly secured the payment of $540,000 evidenced by 90 identical $6000 promissory notes payable to bearer, with interest as set forth in the notes. According to the deed of trust, eight of the notes were to mature each year until January 19, 1982, at which time the last ten notes would mature. In January 1976 Melva v. Baugh ran newspaper ads for a cash foreclosure sale under the Sea Fin deed of trust and on January 22, 1976, she executed a trustee's deed of Sea Fin's motel, trailer *259 park and service station property to Big Ten Holdings, Ltd. Gussie Mae Chaplain, who had been the bidder at the foreclosure sale and had assigned her interest to Big Ten Holdings, joined as grantor in that deed. The latter corporation was owned or controlled by the Chaplain family or by some members of the family. The January 22, 1976, deed recited that the consideration was $585,000, representing the original $540,000 face amount of the promissory notes plus accrued interest "exceeding the sum of $45,000." As indicated in our general findings of fact, the inter-personal relationships within the Chaplain family, as well as the relationships between the Chaplains and certain outsiders, have been characterized historically and up to the present time by arguments, feuds and hostilities which at intervals have had a tendency to erupt violently. Divorces of the Chaplain children have been one contributing factor to such hostilities. Chappy's divorce, which had occurred or was pending at or about the beginning of 1971, raised fears in the minds of Wilson and Elsie that in case of Chappy's death (leaving one child as his heir) they might find themselves in partnership with in-laws *260 toward whom they were very hostile.It was this fear which led to the incorporation of Sea Fin and the transfer to it of the motel, trailer park and service station properties.
The record contains no clear indication as to the purpose for the issuance of the $540,000 trust deed bearer notes. None of the parties placed such notes or any copies of them in evidence. There is a doubt as to whether such notes ever existed. There is likewise a serious doubt, if the bearer notes did exist, as to who were the beneficial owners thereof. Furthermore, it is not clear whether such notes (if they did exist) constituted consideration furnished by Sea Fin for the transfer of the motel, trailer park and service station properties (a transfer which occurred four days prior to the date of the deed of trust), or whether they were issued for some other purposes. The foreclosure sale under the deed of trust occurred shortly after one of the above-mentioned violent intra-family eruptions. On January 8, 1976, Chappy and Suzanne, in culmination of an argument with their parents (during the course of which they were locked out and physically restrained from entering the Kona Kai offices), commenced *261 a lawsuit demanding that Sea Fin issue stock to them for services they had performed, in accordance with alleged prior agreements. In filing the lawsuit they also claimed ownership of the alleged $540,000 in bearer notes (which they had never seen) and prayed for the appointment of a receiver and other equitable relief. Sea Fin's first return (1971) and subsequent returns carry over the basis of the motel, trailer park and service station improvements which had been claimed on Wilson and Elsie's joint return for prior years.
Based upon the entire record, the Court finds that, although title to the property which was transferred to Sea Fin on January 11, 1971, was recorded in Elsie's name, it was owned beneficially by Elsie together with other members of the Chaplain family in undefined proportions; that the stock of Sea Fin was owned beneficially by Elsie together with other members of the Chaplain family in proportions which were likewise undefined, but which were the same as the proportions in which the transferred property was beneficially owned; [22] that the alleged bearer notes secured by the January 15, 1971, deed of trust (if any such notes existed) constituted either stock *262 or securities; and that such notes (if any existed) were beneficially owned in the same proportions in which the transferred property was beneficially owned. Based upon these findings, section 351 of the Code mandates non-recognition of gain on the disputed transfers to Sea Fin. [23] We have found that the beneficial ownership of Sea Fin and of the purported notes was in the same persons and in the same proportions as was the beneficial ownership of the properties transferred to Sea Fin on January 11, 1971. Indeed, respondent concedes (page 422, respondent's opening brief) *263 that each of the individual petitioners was the beneficial owner of a a "substantial portion" of the stock.The only remaining question on this score is whether the purported notes constituted stock or securities. If they were either "stock" or "securities," the result would be the same. Section 351 would preclude the recognition of gain. [24]
It appears that the properties themselves were the only substantial assets that were transferred to Sea Fin on its incorporation in 1971 and that no cash was contributed to the corporation. It likewise appears that the historical *264 profit margin attributable to the business assets transferred to Sea Fin was insufficient to provide for the ratable payment of $540,000 in notes, over an 11 year period. (For this purpose we are using the figures shown on Wilson and Elsie's individual returns, which we view as being closer to reality than the respondent's reconstructed figures. See pages 55 and 80 et seq.) Accordingly, it seems clear that the payment of the purported notes "was dependent upon and at the risk of the success of the venture. The obligations were a participation in the pot luck of the enterprise." Aqualane Shores, Inc. v. Commissioner,269 F.2d 116 (5th Cir. 1959), affg. 30 T.C. 519. The little that the record tells us of the subsequent history of the purported notes confirms a lack of intent on the part of the Chaplains to treat them otherwise than as evidence of a continuing interest in the transferred business.From the recitation in the 1976 trustee's deed, we may conclude that only nominal, if any, payments of principal and interest had been made. The foreclosure itself, we believe, did not reflect a genuine attempt to collect the delinquent amounts due. As *265 stated in Camp Wolters Enterprises, Inc. v. Commissioner,22 T.C. 737 (1954), affd. 230 F.2d 555 (5th Cir. 1956), cert. denied 352 U.S. 826 (involving the tax character of 89 notes which matured serially over a period between the 5th and 9th years after they were issued at the time the obligor corporation was organized): The test as to whether notes are securities is not a mechanical determination of the time period of the note. Though time is an important factor, the controlling consideration is an over-all evaluation of the nature of the debt, degree of participation and continuing interest in the business, the extent of proprietary interest compared with the similarity of the note to a cash payment, the purpose of the advances, etc. It is not necessary for the debt obligation to be the equivalent of stock since section 112(b)(5) [the 1939 Code predecessor of section 351] specifically includes both "stock" and "securities." [25] [22 T.C. at 751.] *266 In contrast with the facts in both Aqualane Shores, Inc. and Camp Wolters Enterprises, Inc., the transferee corporation herein (Sea Fin) consistently used a carried-over basis, rather than a new, "stepped up" basis for depreciation of the transferred property. It would of course have been to its tax advantage to use a stepped-up basis if (as was attempted but rejected by the Courts in the cited cases) the Chaplains and their advisors had viewed the 1971 transfers as genuine purchases rather than a mere continuance of the business in corporate form. Although the intent of the parties has less weight than the objective facts, it is nevertheless a factor which, when added to the factors outlined above, leads the Court to the conclusion that the purported bearer notes were, at most, "securities" as that word is used in section 351 of the Code. Accordingly, we hold that the January 11, 1971, transfers of properties to Sea Fin qualified for nonrecognition of gain under section 351. The Court sustains the petitioners with respect to this adjustment. VII. DIVIDEND INCOME AND FRAUD, INDIVIDUAL PETITIONERS-- FINDINGS OF FACT AND OPINION
The principal issue in the individual *267 cases for 1971 and subsequent years stems from respondent's determination that dividends were received (and not reported) from Ocean Sands, Colony Corp. and Sea Fin. Although respondent determined that some such dividends were in the form of gratuitous use by individual family members of corporate property, the alleged cash dividends account for by far the greater part of the asserted deficiencies. General Dividends Based on Reconstructed Corporate Income
In general, respondent reconstructed the gross receipts of the corporations (as set forth herein at page 30 et seq.). Then, being unable to find such reconstructed income in the corporate treasuries, respondent asserted that the amounts of such gross receipts in excess of the amounts reported had been distributed as dividends to the individual family members. Because the Chaplains never disclosed to the respondent the proportionate stock ownership of the three corporations, respondent (to protect the revenue) asserted the full amount of each corporation's alleged unreported gross receipts against each of the individual parties. Thus he determined dividends from a corporation, in years in which Elsie and all three children *268 were involved, in quadruple the amount of the respective corporation's increase of gross receipts. The individual family members are still at war with each other as to the apportionment among them of the stock of each of the corporations. The Court believes that nothing in evidence herein establishes the basis for a finding as to such apportionment. However, respondent, on brief, would have the Court find that for fraud purposes for the years at issue Elsie owned at least 40% of each corporation's stock; that Chappy and Jerry each owned at least 20% of Ocean Sands and 20% of Colony Corp.; that Chappy and Jerry owned 12-1/2% and 10% of Sea Fin, respectively; and that Linda owned at least 5% of Ocean Sands, 8% of Colony Corp. and 12-1/2% of Sea Fin. It is to be noted that on brief respondent (for fraud purposes only) has lowered his sights and now contends that the individual petitioners received the alleged unreported cash receipts in at least the percentages above indicated, rather than 100% each as determined in the notices of deficiency. Additionally, in determining the amounts of such alleged cash dividends, respondent (on brief) has reduced the amount of cash available for *269 distribution by the sum of capital cash expenditures and loan reductions during the respective taxable years. Thus, by way of example, the notice of deficiency to Wilson and Elsie and the affirmative allegations in respondent's answer for 1973 alleged cash dividends from Ocean Sands in the amount of $93,850. (The same $93,850 was asserted by respondent as 1973 cash dividends to Chappy, Jerry and Linda, each.) On brief, after allowing for capital cash expenditures and loan reductions totaling $40,745, and after an amended reconstruction and downward adjustment of gross receipts, respondent's new figure for earnings available for distribution is reduced from $93,850 to $7,517. This figure is then apportioned among the family members in accordance with their alleged stock ownership. For example, 40% of $7517, or $3006 (as compared with the $93,850 claimed in respondent's notice of deficiency and answer), is now claimed as the minimum cash dividend received by Elsie in 1973 from Ocean Sands. Respondent, although thus lowering his sights for fraud purposes, still adheres to the original theory of 100% distribution of available profits to each of the determined individuals. The aggregate *270 of alleged cash dividends from the three corporations, as claimed in the notices of deficiency and as claimed in respondent's brief, (for both fraud and deficiency purposes) is reflected in the table below. ALLEGED CASH DIVIDENDS FROM OCEAN SANDS, COLONY CORP. AND SEA FIN 1971
1972
1973
1974
WILSON AND ELSIE
Per statutory
notice
$83,980.75
$196,945.00
$207,815.18
$527,176.00
Per
respondent's
brief
for fraud
purposes
$33,838.73
$ 48,290.33
$ 31,927.07
$ 39,471.47
For
deficiency
purposes
$84,597.83
$120,725.83
$ 79,819.67
$ 98,678.67
CHAPPY
Per statutory
notice
$196,945.00
$207,815.18
Per
respondent's brief
for fraud
purposes
$ 20,806.10
$ 14,966.11
for deficiency purposes
$120,725.83
$ 79,819.67
JERRY
Per statutory
notice
$207,815.18
$527,176.00
Per
respondent's brief
for fraud
purposes
$ 14,500.17
$ 15,174.77
for deficiency purposes
$ 79,819.67
$ 98,678.67
LINDA *
Per statutory
notice
$ 93,989.00
$116,642.18
$527,176.00
Per
respondent's
brief
for fraud
purposes
$ 6,130.55
$ 2,205.56
$ 9,069.20
for deficiency
purposes
$ 55,829.83
$ 22,154.67
$ 98,678.67
*271 The Court is not persuaded that there were any cash dividends by the three corporations during the years at issue, except in the relatively minor instance nere-inbelow set forth (at page 120 et seq.) With that exception, the Court finds that no such cash dividends were distributed to the individual petitioners. Respondent bases his argument principally upon his reconstruction of the corporate gross receipts, the looseness of the corporate accounting and fiscal methods, the availability to the individuals of cash in the corporate safes, and the frequent practice of one corporation paying the expenses of another of the commonly controlled corporations and permitting its facilities to be used by another corporation. [26] The Court agrees with respondent that all these factual elements were present in these cases. Notwithstanding the loose practices (which the Court in no way condones), there is a lack *272 of evidence that substantial sums were actually distributed, and the record as a whole supports the individual petitioners' staunch denials that any substantial distributions were made. The weakness of respondent's case on the dividends issue is underscored by the huge discrepancies between the cash dividend figures he asserts for fraud purposes and the figures he asserts for deficiency purposes. Although respondent inserts "at least" before the figures he is now claiming for fraud purposes, we take it that these figures are all that he really thinks he has proven. We know of no case involving discrepancies of such magnitude and view the existence of such discrepancies as an admission of weakness on the cash dividend issues. As a further admission of weakness with respect to the bulk of the alleged cash dividends, we note respondent's statement on brief (after a discussion of certain specific, and mostly relatively minor, cash dividend assertions): There is also some indication that some of the cash was actually distributed to the individual petitioners. Each one of them testified that there was an understanding within the family that everyone would be paid as soon as the corporations *273 started earning money. * * * "Some indication" is not strong enough to overcome petitioners' prima facie case created by their believable denials of substantial cash distributions, nor does it come close to the clear and convincing evidence needed to prove fraud. We point out that our inability to find any basis in the record establishing the proportionate ownership of the corporations would not in itself preclude a finding that a dividend had been paid, especially in the case of non-formal distributions by family owned corporations. Such distributions may constitute dividends, even though they are not distributed pro rata. 58th Street Plaza Theatre, Inc. v. Commissioner,16 T.C. 469 (1951), affd. 195 F.2d 724 (2d Cir. 1952), cert denied 344 U.S. 820. We further note that the facts herein are distinguishable from those in the cases cited to us by respondent for the proposition that there is a constructive dividend when a closely held corporation has unreported cash receipts and when there is an absence of evidence that such receipts were expended for corporate purposes. In those cases relied upon by respondent there were specific *274 findings that the shareholder having dominion over the corporate funds received or retained such funds or diverted them to his own use. Clark v. Commissioner,266 F.2d 698 (9th Cir. 1959); Chesbro v. Commissioner,21 T.C. 123 (1953), affd. 225 F.2d 674 (2d Cir. 1955), cert. denied 350 U.S. 995 (1956); Nash Miami Motors, Inc. v. Commissioner,T.C. Memo. 1964-230, affd. 358 F.2d 636 (5th Cir. 1966), cert. denied 385 U.S. 918 (1966). We can make no such finding here. On the contrary, we are persuaded that, with the exception noted below, such corporate cash and bank accounts as were available for distribution were in fact retained by the corporations. With respect to the loose handling of inter-corporate financial transactions, as above noted, the only situation in which respondent is asking the Court to find a derivative dividend from inter-corporate "transfers" is the acquisition in 1973 by Sea Fin of laundry equipment which was used to a large extent in providing laundry services for Ocean Sands and Colony Corp. Chappy's testimony on the laundry equipment was to the effect *275 that Sea Fin bought the equipment (and presumably continued to own it), that the other corporations had to buy their initial linen, that Sea Fin made the equipment purchases because the other corporations did not have the money to do so, and that it was contemplated that after a period of time the other corporations could pay their share of the operating costs. Although in this situation respondent might have sought to employ his reallocation authority under section 482 of the Code, [27] it is the Court's view that derivative benefits to the stockholders from the laundry dealings were indirect and speculative and not of such nature as to support respondent's constructive dividend contention. See Rushing v. Commissioner,52 T.C. 888, 894 (1969), affd. 441 F.2d 593 (5th Cir. 1971). *276 Specific Cash Distributions
Removal of cash from safes by Suzanne and Chappy. As noted above, in addition to his general position that the amounts of the alleged unreported gross receipts were constructively distributed to the individual family members, respondent contends that certain specific cash transactions constituted dividends. The largest of such transactions was the removal in 1974 by Suzanne and Chappy of slightly over $50,000 from the safes at the Kona Kai and Kona Kai East. They did not know the total amount taken until they counted it while driving to Elizabeth City, North Carolina. At Elizabeth City, on November 7, 1974, Suzanne and Chappy opened two joint savings accounts in the amount of $10,000 each at First Union National Bank and separate savings accounts in the amount of $15,000 each at Wachovia Bank & Trust Company. They gave as their address on these accounts a post office box in Elizabeth City. The address cards of the Wachovia accounts had the word "caution" typed or printed opposite the heading "business and address." Suzanne and Chappy also rented a safe deposit box on November 7 at Wachovia in which they placed the remaining cash and the passbooks. *277 Suzanne and Chappy testified that their purpose in all of this was to establish new banking relationships as a basis for loans to the corporations from the respective banks. They also testified that the removal of funds to Elizabeth City was to avoid the danger of attachments. One week after the accounts had been opened, Suzanne and Chappy (in the company of their parents) began the withdrawal of the funds. Most of the funds had been withdrawn by the end of 1974. The balances were withdrawn in 1975. It was Suzanne's uncontradicted testimony that the funds so withdrawn were used in the construction of the Kona Kai addition which was being built during that period. The Court does not believe the story of Suzanne and Chappy as to their purpose in removing and transporting the cash. A much more likely inference is that they had decided that they had received enough promises of compensation for their labors someday in the future and that it was time for self-help.They were the two who subsequently were locked out of the Kona Kai office and who commenced the litigation referred to above at page 100, et seq. The Court also infers from the fact that their parents accompanied them *278 on their subsequent trips to Elizabeth City that they were discovered (or perhaps they "confessed"). In either event, within 7 days after they removed the cash, they commenced (with their parents guidance) to return the funds. As stated in James v. United States,366 U.S. 213, 219 (1961), When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to the money, and even though he may still be adjudged liable to restore its equivalent." The Second Circuit points out in Gilbert v. Commissioner,552 F.2d 478 (2d Cir. 1977), revg. a Memorandum Opinion of this Court, that the James rule does not apply where there is a "consensual recognition * * * of an obligation to repay." We have concluded that the most reasonable inference to be drawn from the testimony is that before the end of 1974 such consensual recognition existed. This inference is supported by the substantial withdrawal of the funds before *279 the end of 1974 and the completion of such withdrawal in 1975, coupled with the use of the withdrawn funds in the construction of the Kona Kai addition. In the year at issue (1974) most of the funds were restored, and Suzanne and Chappy had acknowledged their obligation to restore the balance. Although we do not condone their actions, we hold that this set of transactions did not constitute a dividend to Suzanne and Chappy.
Sea Fin funds used by Linda for real estate purchase and other purposes. The next largest alleged cash dividend was in the form of a Sea Fin check for $11,000 drawn by Linda on April 29, 1974, to herself. After a recess in the trial, Linda corrected her previously conflicting testimony and admitted that she had used this money, along with some funds of her own, to buy a lot in Virginia Beach. The purchase price of the lot was $14,000. The lot was sold on October 2, 1974, for $17,000, with a check for net proceeds to Linda in the amount of $15,216.04. Linda cashed the check and gave $10,000 to Suzanne and $1000 to Elsie in part payment of Sea Fin salaries due to them. The $11,000 check from Sea Fin was a loan to Linda, which she thus repaid out of the *280 proceeds of the sale of the lot. The money may have been borrowed from a bank by Sea Fin for purposes of funding such loan. In making these findings the Court has taken into account Linda's conflicting testimony and has also taken into account the probability that her memory was jogged during the recess. Linda was truly confused and somewhat frightened during her testimony, and demonstrated a genuine lack of recall as to details. But based upon our observation of Linda and her demeanor and reaction during the trial, this Court feels that she is naive and is the least business-oriented and the least sophisticated of all the Chaplain family members. The Court concludes that her explanation of the $11,000 loan transaction and repayment in the same year--albeit typical of the looseness pervading the Chaplain financial transactions--was the truth. Respondent determined in the notices of deficiency and in his answers on file herein that Linda received cash dividends from Sea Fin in 1972, 1973 and 1974 in the respective amounts of $35,343, $22,792 and $202,215. There are the same amounts as asserted against other members of the family, based on respondent's reconstruction of gross *281 receipts for said years. The Court has rejected such determinations, as hereinabove set forth. Nevertheless, the record herein persuades the Court that Linda did receive, for her own benefit or for the benefit of her immediate family, payments from Sea Fin which were not reported by her as either dividends or as salary. The single, most significant payment in this category was a $4000 Sea Fin check, dated February 28, 1974, payable to cash. Based upon the record, it is probable that Linda used this amount to supplement the cash which, as we found above, she had borrowed from Sea Fin for the purchase of a lot. However, the record is silent as to whether the $4000 was a loan or whether it was ever repaid to Sea Fin. Linda's only explanation was that "it was something for the business." It is well settled that payments made by a corporation for the economic benefit of a stockholder may constitute dividends to the stockholder. American Properties, Inc. v. Commissioner,28 T.C. 1100, 1115 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958). Linda has failed to carry her burden of proof on this score, and we hold that the 1974 $4000 was a dividend to *282 Linda. Respondent also determined that Linda received but failed to report $5200 salary from Sea Fin in 1972 and 1973. (Our disposition of this determination in this section of our Opinion is for purposes of coherence, since it is so closely related to the adjustments discussed above). Many Sea Fin checks in evidence are drawn to cash, to Linda, or to other non-business payees, such as the nursery school attended by Linda's child. We do not understand respondent to be asserting that a portion of these amounts was reportable as dividend income and the balance as salary. However, the record convinces the Court that Linda was compensated on an "ad hoc" basis for her services to Sea Fin. Part of that compensation was in the form of direct payments to her and part in the form of payments to others on her behalf. She has failed to rebut the presumption of correctness of respondent's determination. Welch v. Helvering,290 U.S. 111, 115 (1933). We accordingly find that $5200 salary from Sea Fin was omitted in Linda's returns for 1972 and 1973. Non-cash Dividends
Respondent has alleged non-cash dividends attributable to the free use of corporate apartments *283 or rooms and the free use of corporate automobiles by the various family members. Respondent's determinations were as follows: Wilson and Elsie
1971
1972
1973
1974
use of 2 autos
$4200
4200
4800
4800
abode
$5700
6000
6000
Chappy
abode
$3000 *
3000 *
3000
auto
$2100
2100
Jerry
abode
$3000
3000
auto
$2100
2400
Linda
auto
$2400
2400
The automobiles in question were used intermittently for both business and personal purposes. We are convinced by the testimony of Elsie that she and Wilson had the use of a single passenger automobile, not two. We attribute no portion of their use of a pickup truck to personal expenses. Otherwise, in the absence of proof persuading us to the contrary, the Court finds that in each case 50% of the automobile use was for personal purposes, and, with the exception of Wilson and Elsie, respondent's determinations are sustained to that extent. We have determined that Wilson and Elsie had the use of only a single passenger vehicle; accordingly only 25% of respondent's determinations as to them (set forth above) are sustained. *284 In reaching this result, the Court has applied the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). During the years 1971 through 1974 Wilson and Elsie, Jerry and Chappy lived rent-free for substantial periods in various apartments and other accommodations owned by the corporation petitioners. In dealing with this issue, the Court has applied the standard set forth in section 119 of the Code, which provides for the exclusion from income of an employee the value of lodging furnished by the employer for the convenience of the employer where "the employee is required to accept such lodging on the business premises of his employer as a condition of his employment." We find in the cases of Chappy and Jerry, who lived for substantial periods of time at the Colony Motel, that since they performed most of the maintenance work for the trailer park, there was an implied requirement that one or the other of them be on the business premises at all times. However, we do not feel justified in finding that both were required to be or actually were on the premises of the Colony Motel and Trailer Part at all hours. Accordingly, applying the rule of Cohan,supra, *285 and taking into account their periods of residence on other business premises where they were required to live, we hold that 50% of the amounts set forth in the table above is excludable under section 119 and that respondent's determinations are sustained as to the remaining 50% of each such adjustment (excluding, of course, the 1971 and 1972 adjustments to Chappie's returns which were conceded by respondent). [28]
With respect to Wilson and Elsie, we are unable to find any implied requirement that they be on the premises of the Kona Kai East or any other place they resided, notwithstanding that each of them performed general services for the motels. As to the amounts set forth in the above determination, these petitioners have not carried their burden of proving the incorrectness of respondent's *286 determination. Rule 142(a) of this Court's Rules of Practice and Procedure. We accordingly sustain respondent's above determinations with respect to Wilson and Elsie's lodging. Fraud
As to those cash and non-cash dividend adjustments which we have sustained in this section of our Opinion, we conclude that the fraud penalty should not be applied. If negligence penalties had been asserted, there is little question that in view of the extremely loose practices of the family members in their financial dealing and in their use of corporate facilities, they would have been sustained. But evidence of a failure to report income, standing alone, is not ordinarily sufficient to establish fraud. Merritt v. Commissioner,301 F.2d 484 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. The amounts involved in those instances where we have sustained the respondent's determinations were relatively minor in comparison to the very substantial amounts of cash dividends which respondent asserted, but as to which we have expressed our disagreement even for deficiency purposes. The issue of fraud is one of fact to be determined upon a consideration of the entire *287 record. Stratton v. Commissioner,54 T.C. 255 (1970). Respondent's burden is to establish fraud by clear and convincing evidence. Sec. 7454(a); Imburgia v. Commissioner,22 T.C. 1002 (1954). Based upon the conduct of the individuals involved and the surrounding circumstances (see Stone v. Commissioner,56 T.C. 213, 223-224 (1971)), we hold that respondent has not carried that Burden in proving fraud in the cases of any of the individual petitioners.
VIII. MISCELLANEOUS ISSUES AND FRAUD, INDIVIDUAL PETITIONERS--FINDINGS OF FACT AND OPINION
Wilson and Elsie
Dependency deduction, 1971. On their joint return for 1971 Wilson and Elsie claimed Linda as a dependent. Respondent disallowed the dependency deduction. The record contains no proof of the amount of Linda's total support in 1971 nor the amount contributed to such support by Wilson and Elsie. Linda cannot qualify as a dependent in the absence of proof that Wilson and Elsie provided over half of her support. Section 152(a). Because petitioners have failed to carry their burden of proof, respondent's determination on this issue is sustained. Vance v. Commissioner,36 T.C. 547, 549 (1961). *288 William J. Newton III and Linda
William's wages, 1972. In addition to the determination as to Linda's salary (which we dealt with above at page 121) respondent determined that petitioners had caused Lyn Construction Corporation (William Newton's then employer) to issue a false W-2 form which understated his wages by $12,204.48, and had fraudulently omitted this amount from their return. On brief, respondent has conceded that the Lyn Construction W-2 was correct, and that petitioners reported the full amount. Rental income and expenses, 1973. For 1973 in addition to Linda's salary adjustment respondent determined that the Newtons had received rental income of $2340. Respondent included this amount in the alleged fraudulent understatement of income for 1973. No rental income was reported on petitioners' 1973 return. Petitioners had constructed a duplex, which was completed in February 1973. They rented out half of it for a portion of 1973. Respondent's $2340 figure was based upon 12 months' rental at $195 per month. On brief respondent has reduced the claimed omission to $1755 (9 months rental at $195 per month), but argues that the Court should allow no deductions *289 in view of the fact that the only support for deductions is Linda's uncorroborated testimony. Linda testified that the 1973 "expenses" for one-half the duplex were as follows: Interest
$860
Repairs
25
Property tax
170
Utilities
72
Depreciation
425
$1552
We find in the absence of records that the Newton's rental receipts from the duplex in 1973 totaled $1755. We think it would be unrealistic to accede to respondent's request that no deductions be allowed.It is clear that valid expenses must have been incurred, even though the amounts of such expenses have not been established. We do, however, feel compelled to sustain the disallowance of depreciation in full, since there is not a shred of evidence in the record as to the cost of the property, the allocation of cost between land and improvements, or the useful life of the duplex itself. See Farmer's Life Insurance Company v. Commissioner, 27 B.T.A. 423, 429 (1932); Delsanter v. Commissioner, 28 T.C. 845, 863 (1957). As to the remaining expenses, applying the rule of Cohan, supra, we find and hold that petitioners are entitled to deductions totaling *290 $450 against the $1755 rental receipts. We further find and hold that the resulting omission of $1255 net rental receipts for 1973 was not due to fraud. Our determination is based upon all the facts and circumstances and results particularly because the Court feels that additional offsetting deductions, though not actually proved, were susceptible of proof in this situation. Respondent has not alleged the section 6653(a) penalty for negligence. Rental expense, 1974. The depreciation and other expenses relative to the duplex are again at issue for 1974. The rental income for that year was reported on the Newtons' return and is not at issue. The deductions claimed on the return were: Depreciation
$ 1700.00
Taxes
169.83
Repairs
177.27
Insurance
48.00
Interest
1008.87
Advertising
13.25
Water
77.14
Sewer
43.32
For the reasons set forth above with respect to 1973, we must sustain respondent's full disallowance of depreciation. And for the same reasons, we hold that the Newtons were entitled to total deductions of $600 for the other claimed expense items (which respondent disallowed in full). Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). *291 Capital gain, 1974. In 1974 the Newtons also reported a short term capital gain in the amount of $1068.04 on the sale of the vacant lot acquired in part through Linda's $11,000 loan transaction, described above at page 119. On their 1974 returns, the Newtons claimed a cost basis for such lot in the amount of $15,931.96 and a gross sales price of $17,000.Respondent disallowed the $15,931.96 cost basis in full for lack of substantiation. On brief, respondent has conceded that the Newtons properly reported the short term capital gain on their lot sale. The Court finds no basis for a fraud penalty with respect to the foregoing 1974 adjustments. IX. NEGLIGENCE PENALTIES (WILSON AND ELSIE, AND OCEAN SANDS)-- FINDINGS OF FACT AND OPINION
Respondent determined in his statutory notices that Wilson and Elsie and Ocean Sands were liable for additions to tax (in 1965 through 1969 for the individuals, 1967 through 1969 for the corporation) for negligence under section 6653(a). [29] The burden of proof with respect to this issue is upon petitioners. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967). *292 Petitioners have offered no reasons for their underpayments of tax for these years, but instead insist that their returns are correct as filed. In addition to this absence of proof, there is overwhelming evidence in the record that petitioners' underpayments were due to negligence. We have discussed much of this evidence as factors in our determination of the fraud issues with respect to Ocean Sands and Colony Corp., and we need not repeat it here. As to Wilson and Elsie our findings indicate that they omitted substantial portions of their income in 1965 through 1969 (see page 55), and that their books and records for those years were wholly inadequate.It is sufficient to note that, absent countervailing evidence by petitioner, either failure to keep adequate records ( Marcello v. Commissioner, supra) or a pattern of substantial underreporting of income ( Anders v. Commissioner, 68 T.C. 474, 493 (1977)) alone is a sufficient basis for imposition of the negligence penalty. The Court sustains the asserted negligence penalties. X. STATUTE OF LIMITATIONS (WILSON AND ELSIE AND OCEAN SANDS)-- FINDINGS OF FACT AND OPINION
Petitioners contend *293 that assessment of deficiencies against Wilson and Elsie for the years 1965, 1966 and 1967, and against Ocean Sands for 1967 are barred by the statute of limitations. The deficiency notices for these years were dated March 10, 1972. Section 6501 of the Code provides that, as a general rule, no tax may be assessed more than three years after the return was filed. (The deficiency notices for the years after 1967 were therefore timely under the three-year statute.) However, if a taxpayer omits from gross income a properly includable amount which is more than 25% of the amount reported, the period for assessment is extended to six years. Section 6501(e). As it relates to a trade or business, "gross income" means the total of amounts received from the sale of goods or services, without reduction for the cost of such goods or services. Section 301.6501(e)-1, Proced. and Admin. Regs.Where respondent relies on an exception (such as the substantial omission exception) to the usual three-year limitation period, he has the burden of proving that the exception applies. Stratton v. Commissioner, 54 T.C. 255, 289 (1970); Reis v. Commissioner, 1 T.C. 9 (1942), *294 affd. 142 F.2d 900 (6th Cir. 1944). We hold that respondent has met his burden. He has proven that Wilson and Elsie had gross income which exceeded the amount indicated on their returns by $33,029 in 1965, $37,045.84 in 1966 and $35,408.70 in 1967. Their gross incomes (gross receipts from the Colony Motel and Trailer Park combined with gross rental income from the service station), as reported for those years, were $67,159, $56,809.16 and $46,648.50, respectively. Respondent has also shown that Ocean Sands had gross income of $62,010 in 1967, while only $29,106.51 was reported. In each case more than 25% was omitted; the six year period therefore applies, and assessment is not barred by the statute of limitations. To reflect the foregoing findings and the Court's determinations with respect thereto, as well as to reflect respondent's concessions, Decisions will be entered for the respondent in docket Nos. 5141-76, 5142-76 and 4929-77; Decisions will be entered under Rule 155 in docket Nos. 4261-72, 4262-72, 4728-75, 5139-76, 5140-76, 5143-76, 5976-76, 6602-76, 7352-76, 4927-77, 4928-77, 4930-77, 7489-77, 7509-77, 7510-77, 7560-77, 8027-78, 8028-78, and *295 8029-78. Footnotes
1. Cases of the following petitioners are consolidated herewith: Russell W. Chaplain and Elsie C. Chaplain, docket No. 4262-72; Russell W. Chaplain, Jr. and Mary H. Chaplain, docket Nos. 4728-75, 7352-76, 7509-77; Sea Fin Holding Corporation, docket Nos. 5139-76, 4930-77; Ocean Sands Holding Corporation, docket Nos. 5140-76, 4928-77; Chattel Corporation, docket No. 5141-76; Sea Star Corporation, docket Nos. 5142-76, 4929-77; Colony Holding Corporation, docket Nos. 5143-76, 4927-77; Russell W. Chaplain, Sr. and Elsie C. Chaplain, docket Nos. 5976-76, 7510-77; William J. Newton, III and Linda G. Thornton, Formerly Linda G. Newton, docket No. 6602-76; William G. Chaplain and Sandra B. Chaplain, docket Nos. 7489-77, 8028-78; William J. Newton, III and Linda G. Thornton, docket No. 7560-77; Russell W. Chaplain, Sr. and Elsie C. Chaplain, docket No. 8027-78; William J. Newton, III and Linda G. Thornton, nee Linda G. Chaplain, Formerly Linda G. Newton, docket No. 8029-78.↩
*. This report is prepared pursuant to Rule 182(b), Rules of Practice and Procedure of the United States Tax Court.↩
2. In exerting our best efforts to achieve fair and just results in these cases, the Court has attempted--so far as humanly possible--to separate out and disregard the multitudinous charges and countercharges generated by emotionalism and by venom among the parties, and to confine its holding to the merits of the cases. This has been an exceedingly difficult exercise in judicial objectivity.↩
3. Statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
4. The 14 were the New Castle, Aeolus, Bel Harbour, La Plaza, Empress, Holiday Sands, Sea Hawk, Sea Gull, Aloha, Sand Castle, Saxony, Idlewhyle, Royal Clipper and Belvedere.↩
5. See also Howse v. Commissioner,T.C. Memo. 1974-225 (national average percentage mark-up employed by member-retailers of National Sporting Goods Association used to determine petitioner's mark-up); D & H Bagel Bakery, Inc. v. Commissioner,T.C. Memo. 1955-100↩ (comparable bakeries used to determine bagel prices).
1. Includes gross room rents reconstructed by linen method and gross receipts from telephone charges. ↩
2. Reconstructed by comparable method. ↩
4. Since for 1967 linen method resulted in smaller gross receipts than comparable method, respondent uses the linen method figure. ↩
5. Although comparable method indicates total gross receipts (not just gross room-rents), respondent adds reconstructed telephone charges to arrive at this figure. ↩
3. Includes motel gross receipts reconstructed by comparable method and reconstructed restaurant receipts. ↩
6. Does not include separate reconstruction of restaurant receipts, which has been conceded by respondent. ↩
7. Reflects findings that motel was opened in late Apr. and closed in early Dec. in 1972 and was open from mid-Mar. to mid-Oct. in 1973.↩
6. On brief petitioners' counsel alleges that this is a misrepresentation of Suzanne's testimony. However, this admission is clearly reflected on the record (see page 2882 of the transcript).↩
7. We note that the expense deductions upon which respondent's reconstruction was based included, in all but one year, amounts expended for cleaning as well. Such cleaning expenses should not properly be included in respondent's computation, and we have taken this fact into account also.↩
8. Petitioners' counsel erroneously asserts on brief that this witness testified that there were 144 spaces in 1965.↩
9. Service was provided to 12 additional trailer lots during the years 1963 through 1973, but we are unable to determine from the VEPCO records exactly when service to these lots was initiated.↩
10. During the period March through December, 1964.↩
11. Petitioners' counsel emphatically warns the Court against making approximations in arriving at its findings herein, stating that "[This] approach is highly improper and should be rejected outright." (Pages 185-186, petitioners' reply brief.) Suffice it to say that in the numerous instances in this Opinion where we have applied that rule we have been as generous as possible towards the petitioners. Indeed, were it not for the existence of the Cohan↩ rule, given the weaknesses and ambivalence in the proof in this case, we would have been forced to make determinations which would, without doubt, have resulted in substantially larger deficiencies.
12. Although the $35,000 depreciation base for the service station was carried forward on the individual returns through 1971 (notwithstanding the transfer to Sea Fin in January 1971), the service station disappears from the returns and from respondent's disallowances after 1971. The record affords no explanation.↩
13. The returns showed 1967 at the acquisition date of the sewer line, but 1970 appears to have been the year in which it was placed in service.↩
14. Petitioners' opening brief states, "Upon the government stipulating the cost of certain improvements at the Colony Motel and trailer park there is not any dispute between the Service and the depreciation as set forth on the taxpayers' tax return for depreciation." However, the respondent stipulated only the cost of the service station and equipment. In addition, we note that the most substantial of the "other" items of depreciation, disallowance of which we have sustained in the above paragraph, is the "automotive equipment" claimed to have been acquired by Sea Fin in 1973 for $37,909. There is no evidence in the record concerning this item.↩
15. The all-pervasive atmosphere of intense hostility which characterized the relationship between the parties to these cases effectively precluded a meaningful stipulation between the parties in accordance with our Rule 91, let alone any realistic attempt to settel the multitudinous issues involving miscellaneous deductions. This has placed a heavy and unnecessary burden upon the Court.↩
16. See also Barfield v. Commissioner,↩ a Memorandum Opinion of this Court dated May 14, 1952.
17. See sec. 1.162-21(a) and (b)(1)(ii), Income Tax Regs.; Achelis v. Commissioner,28 B.T.A. 244, 246-247 (1933); Powell v. Commissioner,T.C. Memo. 1967-32↩ (Texas statute).
18. Cf. Macri Corporation v. Commissioner, T.C. Memo. 1976-273; Moyer v. Commissioner, T.C. Memo. 1976-69, affd. per curiam 565 F.2d 152↩ (3d Cir. 1977). 19. This figure was computed in the same manner as the figures for other years, i.e. by applying a 15% discount to the average receipts per room of the comparable motels for each month in 1970.↩
20. Section 6653(b) provides in part as follows: (b) Fraud. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.↩
21. See also Webb v. Commissioner, T.C. Memo. 1966-81, affd. 394 F.2d 366↩ (5th Cir. 1968).
22. In our view, beneficial ownership of both the real property and the stock was in accordance with an oral agreement of the parties. (We do not here determine the nature of that agreement.) Although in many states a parol trust in real property is restricted by the statute of frauds, in Virginia such a trust may be established and enforced. Young v. Holland,117 Va. 433, 84 S.E. 637 (1915). Neither does the Virginia version of the statute of frauds pose any problem to a parol trust in personal property. Riggan's Administrator v. Riggan,93 Va. 78, 24 S.E. 920↩ (1896).
23. SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR. (a) General Rule.-- No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property. ↩
24. The result would also be the same insofar as basis to Sea Fin is concerned. See section 362↩ of the Code.
25. See also Nye v. Commissioner,50 T.C. 203, 212↩ et seq. (1968), where partnership assets were transferred to a corporation in exchange for a 10-year promissory note. The Court held the note to be a security within the meaning of sec. 351(a). The Court also held that the original stock purchase and asset transfer were parts of a single transaction to which sec. 351 applies.
*. No Colony Corp. dividends asserted by respondent for 1972 and 1973.↩
26. Respondent does not, however, ask the Court to include such intercorporate transactions as shareholder dividends with the exception of amounts expended by Sea Fin in 1973 for laundry facilities and linens which were used in substantial part by Ocean Sands and Colony Corp.↩
27. Compare Rubin v. Commissioner,429 F.2d 650 (2d Cir. 1970), revg. 51 T.C. 251↩ (1968), which holds that where section 482 is adequate to deal with the allocation of income and deductions between commonly controlled entities, resort to that section is clearly superior to the use of the assignment of income doctrine (which would have required the shareholder to pay taxes on money he never received).
*. Respondent conceded these two items on brief↩
28. The Cohan↩ rule as here applied reflects the Court's best estimate of the periods of residence on other business premises where Chappie and Jerry were required to live compared with the time they were required to stay at the Colony Motel and Trailer Park. It does not reflect an effort to segregate the value of the meals and lodging between their personal and business aspects.
29. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes.-- If any part of any underpayment (as defined in subsection (c)(1) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩